### In re SPRINGFIELD CONTRACTING CORP., Debtor.

### Kevin R. HUENNEKENS, Trustee, Plaintiff,

### v.

### James H. MARX, Sr., and James H. Marx, Jr., Defendants.

### Bankruptcy No. 89–02057–RS. Adv. No. 92–3025.

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

April 22, 1993.

---

Jacob P. Stroman, IV, Williams, Mullen, Christian & Dobbins, P.C., Richmond, VA, for plaintiff.

Joseph W. Kaestner, Kaestner & Associates, Richmond, VA, for defendants.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court on the trustee's Complaint to recover preferential, unauthorized, voluntary or fraudulent transfers under 11 U.S.C. §§ 547, 550, 549, 544(b), and 548 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. The debtor, Springfield Contracting Corp., filed a petition for relief under Chapter 11 on August 30, 1989. Kevin R. Huennekens, trustee for the bankruptcy estate, filed his complaint on February 10, 1992. This Court entered an order approving compromise on November 13, 1992, which dismissed James H. Marx, Sr., as a defendant.

The trustee alleges that a series of business checks written on the debtor's account in August, September, and October, 1989, show that the defendant, James H. Marx, Jr., received preferential payments, unauthorized post-petition transfers, or voluntary or fraudulent conveyances which should be subject to the trustee's avoiding powers. After a trial held on October 22, 1992, oral arguments heard on December 11, 1992, and a review of the record, the evidence, and argument of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The defendant, James H. Marx, Jr., ("Marx"), worked for Springfield Contracting Corp. ("debtor") as a laborer, foreman, and ultimately in the capacity of vice-president, secretary, treasurer, and one of the corporation's two directors, the other being A.J. Saulsgiver, Jr. ("Saulsgiver"), the former president of the debtor. Marx also served as director of at least one other corporation controlled by Saulsgiver. Marx opened a corporate checking account on behalf of the debtor at the National Bank of Washington ("NBW") on July 31, 1989. Marx and Saulsgiver were authorized to sign checks on that account.

Fourteen checks written on the debtor's NBW account, seven written pre-petition and seven written post-petition, make up the transactions which the trustee seeks to avoid. Marx denies receiving the benefit of six of the seven pre-petition checks, all written to cash and signed by Marx:

| check number | amount | date | memo note | plain-tiff's exhibit |
|---|---|---|---|---|
| 000092 | $ 1,000 | 8/ /89 | "dump" [?] | 2 |
| 000097 | 6,000 | 8/3/89 | "Bemiss" | 5 |
| (unnumbered) | 1,500 | 8/8/89 | "dump" [?] | 13 |
| 112 | 707.59 | 8/15/89 | "dirt" [?] | 3 |
| 120 | 6,495 | 8/18/89 | "P/R" | 14 |
| 159 | 4,018 | 8/25/89 | "W/L pay-roll" | 8 |

Marx admits to receiving the benefit of only one of the seven pre-petition checks:

| number | amount | date | memo note | plain-tiff's exhibit |
|---|---|---|---|---|
| 150 | $35,000 | 8/23/93 | "cash tickets/ back pay" | 1 |

The Court finds that Saulsgiver wrote and signed check number 150 in the amount of $35,000, naming Marx as payee, that Marx received these funds by depositing the NBW check into his personal checking account on August 28, 1989, two days prior to the filing of the Chapter 11 petition. The Court also finds Marx to be a creditor of the debtor in that he testified that he loaned the corporation money and was owed back pay at the time these transactions occurred. The parties stipulate and the Court finds that at all times relevant to this action the debtor was insolvent. Stipulations at ¶ 37. The Court finds that this pre-petition transfer occurred within 90 days of the filing of the bankruptcy petition. The trustee testified and the Court finds that the unsecured creditors will receive less than 100% of their allowed claims. (T. at 15, 1. 12–16.)

Marx also denies receiving any benefit from seven post-petition checks, all written to cash and signed by Marx:

| check number | amount | date | memo note | plain-tiff's exhibit |
|---|---|---|---|---|
| 197 | $ 2,500 | 9/2/89 | "W/L" | 7 |
| 232 | 1,000 | 9/15/89 | (none) | 9 |
| 233 | 1,500 | 9/15/89 | "W/L A/B" | 11 |
| 241 | 7,935 | 9/21/89 | "P/R" | 10 |
| 256 | 17,505 | 9/26/89 | "P/U" ? | 6 |
| 259 | 8,850 | 9/29/89 | "P/R" | 12 |
| 266 | 1,331.63 | 11/21/89 | (none) | 4 |

Of the fourteen pre- and post-petition checks, the Court finds that Marx signed and endorsed, presented for payment, and received cash for eight checks, numbered 112, 120, 159, 233, 241, 256, 259, and 266.

As previously stated Saulsgiver signed check number 150 which was endorsed by Marx and deposited to his account. Someone other than Marx endorsed the following five checks:

| number | amount | endorsement |
|---|---|---|
| 000092 | $ 1,000 | "Jimmie M. Caldwell" |
| 000097 | 6,000 | "Deposit Only" (endorsement not "Marx") |
| (unnumbered) | 1,500 | (no legible endorsement) |
| 197 | 2,500 | "Jimmie M. Caldwell–Deposit Only" |
| 232 | 1,000 | "Jimmie M. Caldwell–Deposit Only" |

On August 28, 1992, Marx, as director, voted for a resolution authorizing Springfield Contracting Corp. to file bankruptcy. Plaintiff's Exhibit 22. On August 30, 1989, Saulsgiver as its president and on behalf of the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, but Marx denies he knew anything about the filing or the debtor's duties under the Code until later. The Court finds that the debtor omitted from its schedules and actually concealed from the Office of the United States Trustee the previous existence of the NBW checking account opened by Marx on behalf of Springfield. The United States District Court for the Eastern District of Virginia found that Saulsgiver committed various criminal offenses including fraud, concealment and perjury in this bankruptcy case. Defendant's Exhibit 7, Statement of Facts at ¶¶ 15, 18, 20, 22, 23, 26, filed September 13, 1990, *United States v. Alfred John Saulsgiver*, Criminal No. 90–00083–R (E.D.Va. Dec. 31, 1990). The statement of facts in the criminal case show that Saulsgiver, Marx's witness, knowingly and fraudulently executed as true and correct under penalty of perjury bankruptcy schedules, financial statements, and monthly reports in the Springfield Contracting bankruptcy that contained multiple false statements, false declarations, misrepresentations, and material omissions. Defendant's Exhibit 7 at ¶¶ 7, 12, 18, 26–29. This Court finds that Saulsgiver's testimony lacks credibility given the Statement of Facts in the criminal matter, Saulsgiver's prior felony conviction for robbery, and his continual invocation of the Fifth Amendment right against self-incrimination during the course of his testimony on Marx's behalf. The statement of facts also show that subsequent to the bankruptcy filing Marx withdrew funds from the secret NBW corporate account and deposited that

money and a check payable to Springfield Contracting Corp. in payment for work done on a contract into Saulsgiver's personal checking account. Defendant's Exhibit 7, Statement of Facts, ¶¶ 13, 21.

## CONCLUSIONS OF LAW

It appears to this Court that the trustee seeks recovery under a plethora of federal bankruptcy and state law grounds, yet as far as applying these avoidance laws to the facts, the trustee lets the Court decide which law to apply. The trustee pled everything and seems content to let the Court sort out his argument. Such a shotgun approach to a complicated and fact specific adversary proceeding places much burden on the Court to fashion a speedy remedy that will not only be fair and just but withstand collateral attack. Defendant's counsel did little to organize the issues in his client's favor. For these reasons, the Court struggled with this Memorandum Opinion for an inordinate length of time. This Court offers no apology for the delay in rendering its opinion.

### I. Pre–Petition Transfers

#### A. *Fraudulent Conveyances Under § 548*

█ The Court chooses the fraudulent transfer theory, 11 U.S.C. § 548, from the trustee's menu of legal grounds to apply to six of the seven pre-petition transfers. Section 548(a) provides that the trustee may avoid any transfer of property of the debtor that was made on or within one year before the date of the filing of the petition, if the debtor received less than reasonable equivalent value in exchange for such transfer and was insolvent on the date that such transfer was made. 11 U.S.C. § 548(a)(2)(A), (B)(i). The parties stipulate insolvency. Only the issue of whether the debtor received reasonable equivalent value remains.

█ Voiding transfers unsupported by "reasonably equivalent value" protects creditors against the depletion of a bankrupt's estate. *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir. 1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960) (cited in *General Electric Credit Corp. v. Murphy (In re Duque Rodriguez)*, 895 F.2d 725, 726 (11th Cir.1990)). The burden of proving lack of "reasonably equivalent value" rests on the trustee challenging the transfer. *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593–4 (11th Cir.1990) (citing *In re Duque Rodriguez*, 895 F.2d 725, 726 n. 1). In the case before this Court, the evidence shows that Marx was the initial transferee of a transfer of the debtor's property. *See* 11 U.S.C. at 550. Marx either received cash upon presentment of the checks or was the holder in due course of a negotiable instrument made payable to "cash." Marx was not being paid a regular salary nor does he contend that these six checks were reimbursements of personal funds previously spent on behalf of the debtor. Marx does not contend that the debtor received reasonably equivalent value directly from him, rather that the debtor received value indirectly from third parties to whom Marx transferred the checks or proceeds thereof. This Court finds that the debtor did not receive "reasonably equivalent value" from Marx as transferee in exchange for its checks written to "cash." The trustee's evidence of a lack of "reasonably equivalent value," however, does not per se establish the avoidability of the transfers. This Court finds that Marx may rebut the presumption of constructive fraudulent conveyance by proving that the debtor either directly or indirectly actually received reasonable equivalent value.

#### 1. The "Bemiss" and two "dump-fee" checks, not endorsed by Marx.

█ The trustee seeks to recover the value of check number 00092, dated early August, 1989, made out to cash for $1000, check number 000097, dated August 3, 1989, made out to cash for $6000, and an unnumbered check, dated August 8, 1989, made out to cash for $1,500. Plaintiff's Exhibit 2, 5, 13; Stipulations ¶¶ 5–8, 42–44, 55–57. Marx wrote and signed these three checks, but someone other than Marx allegedly endorsed and cashed them. The trust-

ee argues that since Marx wrote the checks to "cash" and signed the checks as drawer, that the checks became immediately negotiable in Marx's hands as a holder in due course. The Court finds that since Marx was the drawer and holder in due course of a negotiable check, written payable to cash on the debtor's NBW account, that he was the initial transferee of property of the debtor to whom the trustee can look for recovery. 11 U.S.C. § 550.

Marx argues that the debtor received reasonable equivalent value for these checks. Marx testified that the "Bemiss" check, number 000097, paid for a back hoe and excavator rented by the debtor and that the unnumbered and the 000092 checks paid dump fees incurred in connection with the debtor's asbestos removal operations. The defendant alleges that he did not endorse the checks nor present them for payment nor receive any cash on account of these checks. Marx testified that he would have presented the $6000 check to a salesman at Bemiss Equipment Company as a deposit on rented equipment, but he has no recollection of doing so nor any recollection of receiving the customary rental agreement or receipt. (T. at 53–54.) Regarding the "dump-fee" checks, Marx said he would write checks to cash, leave the amount blank, sign the check, and leave it at the dump to be completed by the landfill employees at the end of the day.

Marx has not proven the that the debtor received reasonable equivalent value by a preponderance of the evidence. He establishes his defense upon his own oral testimony and that of a sympathetic witness, Saulsgiver, who lacks credibility. The Court can find no other corroborating evidence that the debtor incurred a debt for dump fees, rental fees, nor that these checks went to pay debts of the debtor. There is evidence that someone other than Marx endorsed these checks, but there is no evidence that Bemiss Equipment or the landfill endorsed and cashed these checks in payment of value received by the debtor. The trustee presented in evidence an August 1989 "Cash Sales Agreement" from Bemiss Equipment Corp. for $188. Plaintiff's Exhibit 38. This Court finds it un-

usual that the debtor would maintain a record of a $188 cash transaction with a vendor, and not maintain a record of a $6,000 transaction with the same vendor had the debtor actually paid such debt. Marx could have subpoenaed Bemiss for the records but did not. For the foregoing reasons, it appears to this Court that the defendant has failed to show that the debtor received reasonable equivalent value by a preponderance of evidence, and that the transfers of $1000, $6000, and $1,500 represented by checks numbered 000092, 000097, and the unnumbered check are voidable transfers.

### 2. The "dirt" check.

Check number 112, dated August 15, 1989, represents the fourth pre-petition transfer. The Court finds that Marx signed, endorsed, and presented the check for payment, receiving $707.59 in cash therefore. Cashing a check written on the debtor's account makes Marx the initial transferee of property of the debtor to whom the trustee can look for recovery. 11 U.S.C. § 550. While Marx explains that this check was written to cover expenses at the landfill, as indicated by the memo note on the check reading "dirt," he provides no evidence other than his own oral testimony to prove his claim. Marx admits he has no specific recollection whether or not the money he received upon presentment of that check actually went to pay expenses of the debtor. This Court finds that Marx has not shown that the debtor received reasonable equivalent value for check number 112 and that the transfer is voidable in the amount of $707.50.

### 3. The two "P/R" checks.

Checks number 120, dated August 18, 1989, for $6,495, and 159, dated August 25, 1989, for $4,018 represent two pre-petition transfers. Marx admits to being the initial transferee of these funds, as he wrote the checks to cash, signed them, presented them for payment, and received cash therefore. In arguing that the debtor indirectly received reasonable equivalent value for its money, Marx claims that this cash went for weekly payroll on behalf of the corpora-

tion. He explains that Saulsgiver would direct the defendant to write and cash the checks, then give the proceeds to Saulsgiver, who would disburse the cash in payroll envelopes to employees. Marx denies receiving any of the proceeds of these checks for his own benefit. However, Marx has no specific recollection that the proceeds of these checks were for payroll or that he gave this money to Saulsgiver. He can only speculate that he would have done so after reading the letters "P/R" in the memo notation line of the check. Marx has presented no other evidence to this Court that the proceeds of the checks he cashed went to cover payroll; no withholding tax receipts, no payroll records, no employees testifying that they so received such money. This Court finds that Marx has failed to prove the non-avoidability of checks numbered 120 and 159, and that these transfers of $6,495 and $4,018 are avoidable under 11 U.S.C. § 548 as fraudulent conveyances. The transfers voidable under § 549 amount to $19,720.59.

### B. *The $35,000 preferential transfer*

■ The Court chooses to deal with check numbered 150 as a preference under § 547. Regarding preferences, the Bankruptcy Code provides that:

... The trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ...

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The evidence shows that by check number 150, dated August 23, 1989, signed by Saulsgiver and made out to James Marx, Jr., payee, the defendant received $35,000 from the debtor. The trustee argues that this transfer constitutes a preference, as it was made during the preference period for Marx's benefit at a time when the debtor was insolvent and owed Marx money, allowing Marx to receive more than he would have under a Chapter 7 liquidation. The trustee has the burden of proving the avoidability of this transfer under § 547(g).

■ Marx admits that he was an unsecured creditor of the debtor and that the transfer was to or for his benefit. The Court made a finding of fact that the debtor owed Marx money and was insolvent when the transfers were made. The trustee testified that unsecured creditors will receive less than 100% of their claims. Under the rule of *Palmer Clay Products*, if the unsecured creditors will receive less than a 100% payout of their claims, then a pre-petition payment to an unsecured creditor will allow that creditor to receive more than it would have in a Chapter 7 liquidation. 4 *Colliers on Bankruptcy*, § 547.08 at 547–42 (15 ed. 1993) (citing *Palmer Clay Products v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 450–51, 80 L.Ed. 655 (1936)). The court finds that the trustee has proven a prima facie case of preference by a preponderance of the evidence. 11 U.S.C. § 547(g).

However, a trustee may not avoid a transfer—

(2) to the extent the transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; ....

222

11 U.S.C. § 547(c)(2)(A), (B), (C). The Fourth Circuit considered the ordinary course of business defense to the avoidance of preferences in the case of *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479 (4th Cir.1992). The purpose of the ordinary course of business exception is to leave undisturbed normal financial relations because it does not detract from the general policy of § 547 to discourage unusual action by either the debtor or its creditors during the debtor's slide into bankruptcy. *Bigelow*, 956 F.2d at 487; *see Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 801 (4th Cir. 1991). The court noted that the Code does not define the phrases "incurred in the ordinary course of business" or "according to ordinary business terms." *Bigelow*, 956 F.2d at 486 (citing 4 *Collier on Bankruptcy* ¶ 547.10 at 547–50 to –51 (15th ed. 1990)). Courts testing "ordinariness" under § 547(c)(2) focus on the prior conduct of the parties, the amount of the payments, the timing of the payments, the common industry practice, and whether payment resulted from any unusual action by either the debtor or creditor. The focus of the inquiry must analyze the business practices unique to the particular parties. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989). This inquiry is "particularly factual." *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr.D.Mass.1988).

Section 547(c)(2)(A) and (B) contemplate a subjective test: Was the debt and the transfer ordinary as between the debtor and creditor? *See Production Steel, Inc. v. Sumitomo Corp. (In re Production Steel)*, 54 B.R. 417, 423 (Bankr. M.D.S.Tenn.1985). To be subjectively ordinary implies some consistency with other business transactions between the parties. Section 547(c)(2)(C) contemplates an objective test: Was the transaction made according to ordinary business terms? *Id.* (interpreting § 547(c)(2)(D), the same as the current (c)(2)(C)). The objective criteria compares the transaction between the parties with transactions that occur industry-wide. To prevail in the objective test, the creditor must establish that the transfer was an ordinary transaction among other businesses in its industry.

The defendant argues that the trustee may not avoid the $35,000 transfer as it was made in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2). Marx has the burden of proving that the transfer was in payment of a debt *incurred* by the debtor in the ordinary course of business of the debtor and the transferee, the transfer was *made* in the ordinary course of business of the debtor and transferee, and the transfer was made according to ordinary business terms. *See* 11 U.S.C. § 547(c)(2), (g); *WJM, Inc. v. Massachusetts Dept. of Public Welfare*, 840 F.2d 996, 1011 (1st Cir.1988). Marx argues that most of the $35,000 check was in repayment of cash receipts representing expenditures on behalf of the debtor from Marx's own pocket. Marx did not introduce any cash tickets or purchase receipts into evidence to corroborate this claim, explaining that he submitted the receipts to Saulsgiver and did not keep a record of the expenditures himself. Marx does introduce a corporate cash journal ledger and complete set of his personal checking account statements, check stubs, and copies of canceled checks to show that in the past he had made purchases on behalf of the debtor. *See* Defendant's Exhibits 1, 4; (T. at 128).

A review of the defendant's evidence reveals the following facts. The defendant's personal checking account records show that in the fifteen months from October 6, 1987, to December, 1988, Marx wrote checks totalling $7,500 on behalf of the debtor. This summary excludes seven checks, numbered 330, 331, 338, 340, 342, 343 and 344 written between February 10, and March 31, 1988, for which no check amounts can be found. From the documents and testimony in evidence, this Court finds that in the fifteen months prior to 1989, the debtor spent $7,500 of his own money on behalf of the debtor. However, in the first seven months of 1989, Marx wrote personal checks in the amount of $19,977.80 on behalf of the debtor corporation. Defendant's Exhibit 3, January

through July. (Marx wrote no personal checks in August on behalf of Springfield). The Court notes the large difference between the $7,500 the defendant spent in the fifteen months prior to 1989, and the $19,977.80 he spent in the first seven months of 1989.

The evidence shows that in the three months between June 1 and August 28, 1989, the date Marx deposited check number 150, deposits totalled $65,810.[1] Marx testified that during these three months he was not being paid a regular salary. (T. at 91.) The Court finds that none of these deposits represent regular salary payments. Marx testified that some deposits could be from side jobs he did for friends. (T. at 93.) However, on cross-examination by the U.S. Trustee, Marx said he did not report side work income on his tax returns because his friends only paid $100 at a time. (T. at 145.) Each of the deposits shown on the defendant's deposit summary of his checking account are over $1000. Defendant's Exhibit 5. This Court finds that the deposits in the summary are not attributable to side work earnings. Marx testified that there was no way of knowing exactly where other than the debtor the deposits came from, (T. at 93, 127), that the June 12 deposit of $15,133 represents a reimbursement, (T. at 106, 118), that the July 26 deposit of $8,432.50 represents the debtor's transfer of payroll funds that Marx then paid out on July 28 by personal check number 0532, (T. at 107). Under examination by the Court, Marx testified that the $35,000 check was for reimbursement of approximately a three month period of built-up receipts and two or three weeks salary, (T. at 154, 1. 24), and that the $15,133 deposit of June 12 was also a reim-

bursement, but he did not say how long those receipts accumulated. *See supra* note 1.

1. Section 547(c)(2)(A): Whether the transfer was in payment of a debt incurred by the debtor.

■ Marx's own evidence fails to prove that the $35,000 transfer was in payment of debts incurred by the debtor as required under § 547(c)(2)(A). For the fifteen months prior to 1989, Marx only spent $7,500 from his checking account for corporate purposes. During the next seven months of 1989, Marx wrote checks from his personal account for corporate purposes totalling $19,977.80. Assuming the defendant's checking account records are complete, as he says they are (T. at 128), this Court can only establish that Marx spent approximately $27,500 from his checking account on the debtor's behalf. However, the deposits to Marx's checking account representing reimbursements up to and including the time of the August 28 transfer totalled $65,810. The amount of deposited reimbursements exceeds the amount of documented expenditures by over $38,000.

Taken in light of the testimony that Marx was not getting paid a salary and the evidence that he has filed a substantial proof of claim against the debtor, Marx cannot document the excess as being reimbursement for any personal funds spent on behalf of the debtor. Marx testified that although he wrote checks from his account for some purchases, he kept $200 of his own cash at hand everyday to pay for day-to-day expenses of the corporation. However, Marx presented no further check stubs, corporate cash ledgers, cash re-

---

1. Defendant's Exhibit 5 lists the following deposits to his personal checking account:

Deposits

| Date | Amount |
| --- | --- |
| 06/01/89 | $ 3,196.67 |
| 06/12/89 | $15,133.00 |
| 06/19/89 | $ 1,048.57 |
| 07/26/89 | $ 8,432.50 |
| 08/04/89 | $ 3,000.00 |
| 08/28/89 | $35,000.00 |

ceipts, "cash sales agreements," or credible witnesses to substantiate his claim that he spent the $38,000 excess on behalf of the corporation. The Court refuses to believe that Marx spent $38,000 in cash on behalf of the corporation without keeping a record of such. The amount claimed to be nonavoidable cannot be defended by any calculation of evidence before this Court save the defendant's own oral testimony. Based on the defendant's own evidence regarding the $35,000 transfer, this Court finds that the defendant fails to meet the burden of proving that the transfer was in payment of a debt incurred by the debtor. 11 U.S.C. § 547(c)(2)(A).

2. Section 547(c)(2)(B): Whether the transfer was in the ordinary course of business of the debtor and transferee.

The evidence shows that the large expenditures on Marx's part and the large reimbursements on the debtor's part are not in the ordinary course of business of the debtor and transferee. In the fifteen months before 1989, Marx only spent $7500. Yet in the following seven months of 1989, the year in which the debtor declared bankruptcy, Marx spent almost $20,000. This expenditure represents a four fold increase over prior conduct between the debtor and the transferee. This court cannot find that a four fold increase in the year of bankruptcy to be consistent with the prior conduct of the debtor and transferee. *In re Fulghum Constr. Corp.*, 872 F.2d at 743.

In addition, the $65,810 in reimbursements upon which Marx bases his defense occurred within the three months prior to bankruptcy. There is no evidence that such reimbursement has any basis in prior conduct of the parties. The particular $35,000 reimbursement in question amounts to nearly twice that of the next largest reimbursement, and several times more than any other deposit. Marx presented no credible evidence that the debtor ever made any other prior reimbursements of similar magnitude in the ordinary course of business. This Court finds the $35,000 trans-

fer to be out of the ordinary course of business of the debtor and transferee. *See* 11 U.S.C. § 547(c)(2)(B).

3. Section 547(c)(2)(C): Whether the transfer was made according to ordinary business terms.

The three requirements of § 549(c)(2) ordinary course of business defense are written in the conjunctive. The failure to meet any one of the requirements will defeat the defense. *In re R.D.C. Corp.*, 88 B.R. 97, 101 (Bankr.W.D.La. 1988). The requirement that the transfer be "made according to ordinary business terms" looks objectively at the industry-wide practice of the business in which the parties are engaged. *Production Steel, Inc. v. Sumitomo Corp. (In re Production Steel)*, 54 B.R. 417, 423–24 (Bankr. M.D.S.Tenn.1985). In the case of *Production Steel*, the defendant presented no evidence as to the ordinary business terms of the industry. The court held that without such evidence the defendant failed to carry the burden of proof of the ordinary course of business defense. *See* 11 U.S.C. § 547(c)(2)(C). Similarly, Marx has presented no evidence that the $35,000 transfer was made according to ordinary business terms. Without such evidence, Marx cannot satisfy the burden of proving an ordinary course of business defense. For the foregoing reasons, it appears to this Court that the $35,000 transfer is avoidable as a § 547(b) preference.

## II. Avoidance of Post–Petition Transfers Under § 549

The remaining transfers occurred after the filing of the Chapter 11 bankruptcy petition on August 28, 1989. The Trustee seeks to recover these transfers under 11 U.S.C. § 549 which grants the trustee power to avoid post-petition transactions. Section 549 allows the trustee to avoid a post-petition transfer of property of the estate that is not authorized under this title or by the court. 11 U.S.C. § 549(a)(1), (2)(B). The trustee alleges that these transfers were not authorized under the Bankruptcy

Code. Section 363(c)(1) states that a trustee of a debtor authorized to do business may use property of the estate in the ordinary course of business without notice and a hearing. *See* 11 U.S.C. § 363(c)(1). Section 1107 states that a debtor-in-possession in a Chapter 11 case has all the rights and powers of a trustee. 11 U.S.C. § 1107; *see Johnson v. First Street Companies, Inc. (In re Waterfront Companies, Inc.),* 56 B.R. 31, 34–35 (Bankr.D.Minn.1985) (debtor-in-possession may be properly regarded as a trustee for § 549(a) purposes). James H. Marx, Jr., acted on behalf of Springfield Contracting either as Saulsgiver's agent or by virtue of Marx's position as Vice President of the debtor corporation. *See* Stipulations, ¶ 2. Marx admits not receiving authorization from the U.S. Trustee or court, but argues that the Code authorizes the transfers in the ordinary course of business. 11 U.S.C. § 363(c)(1).

This Court notes that § 549(d) limits the time within which the trustee may avoid post-petition transfers under this section to two years after the date of the transfer sought to be avoided. 11 U.S.C. § 549(d)(1). The Trustee filed this action more than two years after the last transaction occurred. Since the defendant did not plead the statute of limitations as an affirmative defense, this Court deems the limitation § 549 places on actions to recover post-petition transfers to be waived. The Court notes, additionally, that case law exists allowing a trustee to bring a § 549 avoidance action after the statute of limitations provided under 11 U.S.C. § 549(d)(1) has expired. *See, e.g., Bookout Holsteins, Inc. v. Superblend, Inc. (In re Bookout Holsteins, Inc.),* 100 B.R. 427 (Bankr. N.D.Ind.1989) (§ 549 statute of limitations tolled where transfers trustee seeks to avoid were concealed).

### A. *The checks sought to be avoided.*

Of the seven post-petition checks, Marx argues that the proceeds of checks numbered 197 and 232, for $2,500 and $1,000 respectively, went to pay dump fees. He argues that it was the ordinary course of business to sign checks made payable to "Cash," leave the checks at the landfill, and allow an employee at the landfill to complete the amount at the end of the day to cover the fee. Marx points out that the name "Jimmie M. Caldwell" and the words "Deposit Only" appear on the reverse of the checks, indicating that Marx did not present these checks for payment nor received any cash therefore.

Marx admits to writing, signing, endorsing, presenting, and presenting for payment the remaining checks and receiving cash therefore. Marx argues that it was the ordinary course of business of the debtor for Marx to cash checks for payroll and bring the proceeds to Saulsgiver, who would disburse the payroll in cash to the debtor's employees. Check number 241 for $7,935, number 256 for $17,505, and number 259 for $8,850 represent these transfers. Marx presented no payroll records nor any other documentary evidence that the proceeds of checks numbered 241, 256, or 259, went to pay the employees' wages. Marx also argues that it was in the ordinary course of business of the debtor for him to write checks to cash, collect the proceeds, and pay for supplies and materials necessary for the day-to-day operations of the debtor's business. Check number 233 for $1,500 and number 266 for $1,331.63 represent these transfers. Marx presented no cash receipts evidencing that the proceeds of checks numbered 233 or 266 were used to pay expenses incurred in the ordinary course of business. The seven post-petition transfers sought to be avoided amount to $40,621.63.

### B. *Ordinary course of business under § 549.*

The phrase "ordinary course of business" arises in connection with both pre-petition preference defense and post-petition use of the debtor's property. The case of *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700 (9th Cir.1988), the Court of Appeals describes the § 363(c)(1) "ordinary course of business" exception relevant to § 549 a bit differently from the § 547(c)(2) ordinary course of

business defense to voiding preferences. The *Dant & Russell* court found two tests helpful in determining ordinary course of business under § 363(b): 1) the horizontal dimension test and 2) the vertical dimension or creditor's expectation test. The horizontal dimension test involves an industry-wide perspective in which the debtor's business is compared to other like businesses. *Id.* at 704–05 (citing *Johnson v. First Street Companies, Inc. (In re Waterfront Companies, Inc.)*, 56 B.R. 31, 34–35 (Bankr.D.Minn.1985)). The test is whether the post-petition transaction is of a type that other similar businesses would engage in as ordinary business. *Id.,; In re Johns–Manville Corp.*, 60 B.R. 612, 618 (Bankr. S.D.N.Y.) *rev'd on other grounds*, 801 F.2d 60 (2d Cir.1986). A transaction occurs in the debtor-in-possession's ordinary course of business when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business. *Dant & Russell*, 853 F.2d at 704; *Johns–Manville*, 60 B.R. at 618. This showing is required merely to assure that neither the debtor nor the creditor did anything abnormal to gain an advantage over other creditors. 853 F.2d at 704 (citing *In re Economy Milling Co., Inc.*, 37 B.R. 914, 922 (D.S.C.1983)).

 In the *Dant & Russell* case, the Ninth Circuit had no trouble finding that the defendant who renewed a lease met this test. The debtor-in-possession's leasing activities occurred over a thirteen year period, therefore, a post-petition lease renewal occurred in the ordinary course of business. The facts of the case before this Court, however, do not meet with the criteria of the horizontal dimension test. If, for example, this Court were to consider whether the contracting industry paid cash to its day laborers in the ordinary course of business, the answer would probably be yes. But a question more fact specific to this case would be whether contractors industry-wide ordinarily wrote payroll checks to cash, allowed a creditor (albeit an officer of the debtor) to negotiate the checks, then dispensed the cash to employees without keeping any payroll records or withholding payroll taxes. Since there is no evidence

before this Court that in the ordinary course of their business contractors engage industry-wide in the procedures Marx admits to doing, this Court must find such behavior not to be in the ordinary course of business of contractors industry-wide. *See In re Waterfront Cos.*, 56 B.R. at 34–35 (test is whether the post-petition transaction is of a type that other similar businesses would engage in their ordinary course of business).

What is more relevant to this case is whether there has been a showing to assure that neither the debtor nor the creditor has done anything abnormal to gain an advantage over other creditors. The short answer is no. Marx has made no showing to assure that he did not do anything abnormal to gain an advantage over other creditors. Marx has not proven that he used the property of the estate he received from post-petition transactions in the ordinary course of business of the debtor. *Dant & Russell*, 853 F.2d at 704.

 Marx also fails the vertical dimension or creditor expectation test. *Dant & Russell*, 853 F.2d at 705. This test inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit. "The touch stone of 'ordinariness' is ... the interested parties' reasonable expectations of what transactions the debtor-in-possession is likely to enter in the course of its business." *Id.* (quoting *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y.1983)). Again this Court might ask itself whether a creditor would expect the debtor-in-possession to pay employees, buy materials, or pay dump fees in the ordinary course of business. Were that the issue, the Court might find that a creditor would expect such transactions. But the answer changes when the issue is whether a creditor would expect the debtor-in-possession to give another creditor signatory rights on a secret checking account, who would then write checks to "cash" for payroll and then cash them, one in the amount of $17,500, leave signed blank checks at the landfill for a third party to complete in the amount of thousands of dollars, pay for supplies with

checks payable to cash, and fail to keep records that could prove that these expenditures actually were made in the ordinary course of business, that is, for the benefit of the debtor. Asked in this way, and in the absence of evidence to the contrary, this Court must find that a creditor could not reasonably expect the debtor-in-possession to enter into such transactions. The economic risk of such flagrantly unbusinesslike behavior would be more than any creditor should reasonably anticipate. The Court finds that Marx fails to meet the creditor expectation test of the ordinary course of business defense. For the foregoing reasons, this Court finds that the trustee may recover post-petition transfers in the amount of $40,621.63.

The Court finds that the trustee has proven the avoidability of six of the prepetition transfers as constructive fraudulent conveyances in the amount of $19,-720.59. Marx failed to show that the debtor received reasonable equivalent value in exchange for the transfers to him. 11 U.S.C. § 548(2). The Court further finds that the trustee has met its burden of proving the avoidability of the $35,000 transfer as a preference. *See* 11 U.S.C. § 547(b), (g). The Court finds that the defendant has failed to prove the nonavoidability of the preferences under the ordinary course of business exception. *See* 11 U.S.C. § 547(c)(2), (g). The Court also finds that the trustee may avoid the post-petition transfers in the amount of $40,-621.63 as not being authorized by the Code. The Court further finds that the defendant did not prove that the post-petition transfers occurred in the ordinary course of business. *See* 11 U.S.C. § 363(c)(1). The transfers that the Court find to be avoidable amount to a total of $95,342.22. Because this Court has found all the transfers avoidable under §§ 547, 548 and 549, it does not need consider the trustee's additional grounds for recovery.

An appropriate order will issue in conformity with this opinion.