**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: JOHNSON BROTHERS TRUCKERS
INCORPORATED,

*Debtor.*

---

P. WAYNE SIGMON, Trustee in
Bankruptcy for Johnson Brothers
Truckers, Incorporated,

*Plaintiff-Appellee,*

v.

TERESA G. BUTNER,

*Defendant-Appellant,*

and

WILLIAM E. BUTNER; AMTRUC,
INCORPORATED; OLD WEST TRADING
COMPANY,

*Defendants.*

No. 99-1625

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Vorhees, District Judge.
(CA-97-14-5-V, BK-92-50554, AP-94-5237)

Argued: January 25, 2000

Decided: May 15, 2001

Before MOTZ and KING, Circuit Judges, and
John T. COPENHAVER, Jr., United States District Judge for the
Southern District of West Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Copenhaver wrote the opinion, in which Judge Motz and Judge King joined.

---

## COUNSEL

**ARGUED:** J. Steven Brackett, J. STEVEN BRACKETT LAW OFFICE, Hickory, North Carolina, for Appellant. John W. Taylor, MITCHELL, RALLINGS, SIGNER, MCGIRT & TISSUE, P.L.L.C., Charlotte, North Carolina, for Appellee. **ON BRIEF:** David C. Pishko, William E. Butner, H. Kent Crows, ELLIOT, PISHKO, GELBIN & MORGAN, P.A., Winston-Salem, North Carolina, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

COPENHAVER, District Judge:

This is an appeal from an order entered March 25, 1999, by the United States District Court for the Western District of North Carolina, affirming the bankruptcy court and dismissing the appeal of Teresa Butner taken from the bankruptcy court's order entered on December 31, 1996, in an adversary proceeding filed against her by the trustee in bankruptcy for the debtor, Johnson Brothers Truckers, Inc.

Ms. Butner appeals from the district court's affirmance of the order of the bankruptcy court awarding judgment against her in the amount of $302,500. The judgment consists of three components:

> $100,000 in preferential transfers received by Ms. Butner, an insider, on an antecedent debt during the year prior to the

filing by the debtor of its Chapter 11 petition on August 18, 1992. (11 U.S.C. § 547)

$95,500 in fraudulent transfers received by Ms. Butner during that same year prior to bankruptcy. (11 U.S.C. § 548)

$107,000 in post-petition transfers received by Ms. Butner from the time of the filing of the Chapter 11 petition until its conversion to Chapter 7 liquidation on May 25, 1993. (11 U.S.C. § 549)

The district court concluded that the bankruptcy court appropriately found that Ms. Butner had failed to meet the burden of proving her affirmative defense that the transfers were in the ordinary course of business as to both the $100,000 preference and the $107,000 in post-petition transfers and that the bankruptcy court properly found that reasonably equivalent value had not been given for any of the $95,500 in fraudulent transfers. We affirm.

I.

The debtor, Johnson Brothers Truckers, Inc., was engaged in long haul trucking, primarily transporting furniture along the eastern seaboard from its terminals located in North Carolina and New Jersey.

Teresa Butner claims that she provided short and long-term financing to the debtor to enable it to continue its operations. Her husband, William E. Butner, served as attorney for the debtor and, until just prior to the debtor's first venture into Chapter 11 in 1978, held a 50% ownership interest in the debtor. After relinquishing his ownership interest, Mr. Butner continued to remain directly involved in the operations of the company until May 25, 1993, the date on which the debtor's bankruptcy case was converted to Chapter 7. Throughout that period, Mr. Butner and the debtor's president, Gerald Johnson, controlled the debtor's operations along with several alter egos.

Ms. Butner paid $100,000 to Granite Bank on August 26, 1991, in order to satisfy partially a loan by Granite Bank of $548,769 to the debtor, Johnson Brothers Truckers, Inc., William E. Butner and Ger-

ald Johnson. The proceeds of the Granite Bank loan were used to cover the loss to banks that were victims of a check kiting scheme engaged in by the debtor along with Amtruc Incorporated, whose sole shareholder was Mr. Butner, and G&G Trucking. The $100,000 paid by Ms. Butner to Granite Bank was set up on the debtor's books as a long-term obligation of the debtor due and owing to her as of September 3, 1991.

In addition, short-term financing is claimed to have been provided to the debtor by Ms. Butner pursuant to an alleged lease/purchase agreement between the debtor and her. In particular, in order to provide the debtor with working capital, Ms. Butner claims that she would purchase trailers from the debtor both in her individual capacity and in her capacity as President and sole shareholder of Old West Trading Company, and then lease them back to the debtor at the rate of $250 per trailer per month. The alleged lease/purchase agreement between the debtor and Ms. Butner was unwritten and informal. The debtor did not transfer the certificates of title to its trailers to Ms. Butner when she is said to have purchased them. Instead, according to Ms. Butner, the certificates of title were held by her husband until the lease payments were made in full. No payment by Ms. Butner for the trailers supposedly purchased by her from the debtor is shown.

Ms. Butner acknowledges that she received all of the payments aggregating $302,500. Those funds were deposited by her husband into a "trust account" maintained by him. It was through that same account that Ms. Butner allegedly paid for trailers purchased from the debtor. She and Mr. Butner have refused to allow the trust account records, except for certain checks selected by them, to be examined by anyone other than their own accountants.

By order entered on February 9, 1996, the bankruptcy court granted partial summary judgment in favor of the trustee as to the elements of each of his claims but ruled that a question of fact remained as to whether Ms. Butner could show the existence of indebtedness owing by the debtor to her at any given time and prove the affirmative defense of ordinary course of business. After a three-day trial in October, 1996, the bankruptcy court found that she had not done so. Judgment was entered in favor of the trustee and against Ms. Butner in the amount of $302,500.

We review the judgment of the district court sitting in review of a bankruptcy court *de novo*, applying the same standards of review applied in the district court. *In re Wilson*, 149 F.3d 249, 251-52 (4th Cir. 1998). The bankruptcy court's findings of fact will not be set aside unless clearly erroneous. Bankr. R. 8013; *In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992). This standard also applies to a bankruptcy court's determination that a party has failed to satisfy its burden of proof. *Bartmess v. Federal Crop Ins. Corp.*, 845 F.2d 1258, 1261 (5th Cir. 1988). Under the clearly erroneous standard of review, "findings of fact will be affirmed unless [the appellate court's] review of the entire record leaves [it] with the definite and firm conviction that a mistake has been committed." *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir. 1985). Our review of the bankruptcy court's application of the law is *de novo*. *In re Johnson*, 960 F.2d at 399.

## II.

Generally, when an insolvent debtor makes a payment to an unsecured creditor within 90 days before a bankruptcy petition is filed, that payment constitutes a "preference" under 11 U.S.C. § 547(b) that may be recovered by the trustee, thereby forcing that creditor to stand in line with the rest of the debtor's unsecured creditors.[1] *Advo-System,*

---

[1] Section 547(b) provides that:

  (b)  Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

    (1)  to or for the benefit of a creditor;

    (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3)  made while the debtor was insolvent;

    (4)  made—

      (A)  on or within 90 days before the date of the filing of the petition; or

      (B)  between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

*Inc. v. Maxway Corp.*, 37 F.3d 1044, 1045 (4th Cir. 1994). This period is extended for payments made to insiders up to one year prior to the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(b)(4)(B). The bankruptcy court concluded that Ms. Butner was an "insider" for purposes of § 547 by virtue of her relationship to William Butner who, following an extensive evidentiary hearing tracking the entire history of Mr. Butner's relationship with the debtor, was found by the bankruptcy court to be an "insider" of the debtor. Ms. Butner does not appeal the bankruptcy court's decision in this regard.

We have recognized that two major policies drive § 547(b):

> First, the avoidance power promotes the "prime bankruptcy policy of equality of distribution among creditors" by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate. Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation.

*Advo*, 37 F.3d at 1047 (*citing Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 797-98 (4th Cir. 1991)).

### A.    *The $100,000 Preference*

Ms. Butner claims that $100,000 of the payments made by the debtor to her within one year prior to the filing of the bankruptcy peti-

---

(5)    that enables such creditor to receive more than such creditor would receive if—

   (A)   the case were a case under chapter 7 of this title;

   (B)   the transfer had not been made; and

   (C)   such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

tion are not avoidable because they constituted repayment of a $100,000 loan and are protected by the ordinary course of business exception of § 547(c)(2).[2]

Section 547(c) provides the unsecured creditor several shields with which it can defend against the trustee's avoidance power. *Advo*, 37 F.3d at 1045. One such shield, found in § 547(c)(2), is known as the "ordinary course of business" exception which applies when the creditor can establish that: (1) the underlying debt on which payment was made was "incurred by the debtor in the ordinary course of business or financial affairs" of the debtor and creditor; (2) the transfer was "made in the ordinary course of business or financial affairs" of the debtor and creditor; and (3) the transfer was made "according to ordinary business terms." *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 486 (4th Cir. 1992) (*citing* 11 U.S.C. § 547(c)(2)).

The "ordinary course of business" exception operates as an affirmative defense. The recipient of such a payment has the burden of proving by a preponderance of the evidence that each payment falls within § 547(c)(2). *See* 11 U.S.C. § 547(g); *Advo*, 37 F.3d at 1047; *see also A.W. & Assoc., Inc. v. Florida Mining and Materials*, 136 F.3d 1439, 1441 (11th Cir. 1998); *Logan v. Basic Distribution Corp.*, 957 F.2d 239, 242 (6th Cir. 1992).

The Bankruptcy Code fails to define either "ordinary course of business" or "according to ordinary business terms." The legislative history states simply that the "purpose of [the ordinary course of business] exception is to leave undisturbed normal financial relations,

---

[2]     (c) The trustee may not avoid under this section a transfer —

* * *

(2) to the extent that such transfer was —

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferree; and

(C) made according to ordinary business terms.

because [this exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874. Thus, "those courts testing a transfer for 'ordinariness' under section 547(c)(2) have generally focused on the prior conduct of the parties, the common industry practice, and, particularly, whether payment resulted from any unusual action by either the debtor or creditor." *In re Jeffrey Bigelow*, 956 F.2d at 486 (citing 4 Collier on Bankruptcy ¶ 547.10 (15th ed. 1990)).

In order to ascertain whether or not a transfer was made in the ordinary course of business, the court must "engage in a 'peculiarly factual' analysis." *Id.* at 486 (*quoting In re First Software Corp.*, 81 B.R. 211, 213 (Bankr. D. Mass. 1988)); *In re Fulghum Const. Corp.*, 872 F.2d at 743. The "focus of [the] court's inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration." *In re Jeffrey Bigelow*, 956 F.2d at 486. In conducting its inquiry, the court's "[a]ttention should be drawn to the reality of the situation and not the formal structure." *Id.* at 488.

In addition, the court must ascertain whether a preferential payment was made in accordance with ordinary business terms. We have recognized that "[a] payment is made according to ordinary business terms if the payment's terms are not unusual when compared with the prevailing standards in the creditor's industry." *Advo*, 37 F.3d at 1048. In other words, "the benchmark for ordinariness is the norm in the creditor's industry." *Id.*

The bankruptcy court found that Ms. Butner failed to sustain her affirmative defense that the preferential transfers met the ordinary course of business requirements of § 547(c)(2). The $100,000 debt set up on the debtor's books as a long-term obligation as of September 3, 1991, may for our purpose be assumed to have been incurred in the ordinary course of business. That is by no means clear. The debt to Granite Bank on which the $100,000 payment was made by Ms. Butner was owing not only by the debtor but also by Mr. Butner who himself paid $100,000 thereon, as did Gerald Johnson. The obligation

to Ms. Butner could just as well be regarded as one owing to her by Mr. Butner and Mr. Johnson.

In any event, the payments thereon have not been shown either to have been made in the ordinary course of business of the debtor and Ms. Butner or according to ordinary business terms. It is first observed that no terms were specified. The $100,000 "long-term" debt is not evidenced by a promissory note or any memorandum. The interest rate it was to bear is unstated. The terms for its repayment, including the time and amount of repayment and whether by a single payment or installments, is not stated. Ms. Butner has failed to meet her burden of showing that payments thereon were made according to ordinary business terms.

The payments which Ms. Butner claims were made on the $100,000 loan are within a group of 65 checks, drawn on the debtor, transferring sums to Ms. Butner over an 11-month period from September 6, 1991, to the filing of the Chapter 11 case on August 18, 1992, aggregating $195,500.

The $95,500 portion of that sum is said by Ms. Butner to have been paid to her by the debtor as lease/purchase payments on trailers which she claims to have bought from and then leased back to the debtor but for which there is no underlying documentary or record evidence. Those payments continued while the Chapter 11 case was pending for some nine months down to the conversion to Chapter 7 on May 25, 1993, by which time 42 post-petition payments aggregating $107,000 had also been made. Inasmuch as the payments on the alleged $100,000 debt and the lease/purchase trailers are bound together, the circumstances surrounding both are pertinent to a consideration of issues relating to each.

The $195,500 in payments are each made for an unidentified purpose. The "memo" line of each check is blank without any description of why it was written. The 65 payments lack regularity. They range from $1,500 to $7,500 and they are made sometimes twice a day, sometimes once a week and on two occasions after the lapse of two or three weeks. Just over half, $98,500, came in a concentrated period of 29 days from November 26 to December 24, 1991. The last payment was some seven months prior to bankruptcy and would thus

escape the usual ninety-day preference period, a time that is extended to one year if the recepient is found to be an insider. The payments are invariably in multiples of $500, although the "lease/purchase agreement" is said to have required a $250 monthly payment per trailer and, accordingly, would be expected to produce some payments ending in $250 or $750 denominations. Throughout the 11-month period down to the Chapter 11 filing, the debtor seems to have contemplated a bankruptcy proceeding inasmuch as its attorney signed the necessary petition, prepared by Mr. Butner, under date of July 29, 1991, which date was crossed through and revised on two occasions by the time the Chapter 11 petition was filed on August 18, 1992.

The payment of $98,500 to Ms. Butner during a one-month period at the end of 1991 constituted unusual action on the part of the debtor that enabled Ms. Butner rather quickly to recover from the debtor the entirety of her $100,000 payment to Granite Bank that she had made for the benefit of her husband as well as the debtor and Gerald Johnson. It came at a time when the debtor's bankruptcy was contemplated. In view of the insider role that Mr. Butner played in the affairs of the debtor, he was in a position to cause the debtor's checks to be issued to Ms. Butner and then deposit them in the trust account which he maintained. Under those circumstances it became particularly incumbent upon Ms. Butner to come forward with evidence to carry the burden of establishing the affirmative defense of ordinary course of business. Instead of doing so, the Butners refused to allow the trustee in bankruptcy to examine the records of the trust account. Ms. Butner has thus failed, as the bankruptcy court found, to carry the burden of proving that repayment of the $100,000 was made in the ordinary course of the business of the debtor and that of Ms. Butner. The bankruptcy court's finding is not clearly erroneous.

## B.   *The $107,000 Post-Petition Payments*

Section 549 of the Bankruptcy Code provides, in pertinent part, that:

> (a)   [T]he trustee may avoid a transfer of property of the estate —

(1)      that occurs after the commencement of the
          case; and

\* \* \*

(2)(B)   that is not authorized under this title or by
          the court.

11 U.S.C. § 549(a). According to Ms. Butner, $107,000 of post-petition transfers here, though not authorized by the bankruptcy court, were payments made in the ordinary course of the debtor's business and are authorized by both 11 U.S.C. § 364(a) and 11 U.S.C. § 363(c)(1).

Section 364(a) of the Bankruptcy Code provides that the debtor-in-possession "may obtain unsecured credit and incur unsecured debt in the ordinary course of business. . . ." 11 U.S.C. § 364(a). Section 363(c)(1) states that the debtor-in-possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing. . . ." *Id.* at § 363(c)(1). The burden is on the recipient to prove that post-petition transfers occurred in the ordinary course of business.[3] *See* F.R.B.P. Rule 6001 (one "asserting the validity of a transfer under § 549 shall have the burden of proof."); *see also Springfield Contracting Corp. v. Huennekens*, 154 B.R. 214 (Bankr. E.D. Va. 1993). It is from these two provisions that Ms. Butner contends that the post-petition payments made to her pursuant to the alleged lease/purchase agreement were authorized by the Bankruptcy Code and therefore not avoidable by the trustee.

---

[3]Under § 364(b), if the transaction is not in the ordinary course of business, "[t]he court, after notice and hearing, may authorize the [debtor-in-possession] to obtain unsecured credit or to incur unsecured debt." The bankruptcy court found, in granting partial summary judgment, that the alleged lease/purchase transactions were financing transactions intended as secured rather than unsecured financing such that authorization by the bankruptcy court was required under § 364(b). No court approval having been obtained, the bankruptcy court held at the summary judgment stage that the post-petition transfers were voidable under § 549, absent establishment by the Butners of an affirmative defense.

Other than the self-serving statements of appellant and her husband, however, there is no evidence in the record that shows that Ms. Butner purchased trailers from the debtor. While Gerald Johnson, the debtor's president, testified that the debtor leased trailers from Old West Trading Company for about a year ending in 1992, he does not state that Ms. Butner actually purchased any trailers from the debtor. At best, Johnson stated at trial that "he [Mr. Butner] would purchase some trailers and lease them to us and then turn around and then sell them." Moreover, the financial records offered at trial, through the testimony of the debtor's accountant, Edward Bowers, do not reflect any accounting entries which support Ms. Butner's contention that she purchased trailers from the debtor. According to Mr. Bowers, the only entry reflecting any payment made by Ms. Butner was the one-time $100,000 entry on the debtor's books in the long-term obligation account as of September 3, 1991. The only other entries in that account reflect the $302,500 in payments made to her. There is simply no evidence that demonstrates that Ms. Butner made any payment to the debtor to purchase its trailers or that she ever acquired title thereto. The bankruptcy court aptly found that Ms. Butner failed to show that the post-petition transfers aggregating $107,000 were undertaken in the ordinary course of business. Indeed, the records of the debtor and those made available by Ms. Butner do not reflect any consideration as having been given by her for the post-petition transfers. Accordingly, the court is unable to find with a "definite and firm conviction that a mistake [was] committed" by the bankruptcy court when it found an absence of credible evidence to support the validity of the $107,000 in post-petition transfers to Ms. Butner. *See Harman*, 772 F.2d at 1153.

### C. *The $95,500 Pre-Petition Fraudulent Transfers*

As noted, Ms. Butner also received pre-petition payments from the debtor totaling $95,500 during the 11-month period prior to the Chapter 11 filing. The bankruptcy court found those payments to be avoidable as fraudulent conveyances pursuant to 11 U.S.C. § 548(a).

Section 548(a) of the Bankruptcy Code provides, in pertinent part, that:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the

debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily —

* * *

(2)(A)   received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i)   was insolvent on the date that such transfer was made. . . .

11 U.S.C. § 548(a).

The bankruptcy court found, and Ms. Butner does not dispute, that the debtor was insolvent during the period one year prior to the bankruptcy. The issue, then, is whether reasonably equivalent value was given in exchange for the $95,500 in payments. This court, in *In Re Jeffrey Bigelow*, recognized that reasonably equivalent value is not susceptible to simple formulation. 956 F.2d at 484. "As long as the unsecured creditors are not worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." *Id.*

Ms. Butner contends that the bankruptcy court erred in finding that the debtor did not receive reasonably equivalent value for these transfers. In support of this contention, she directs us to the testimony of the debtor's accountant, Edward Bowers, who testified at trial that the debtor's books reflected that at the time of the conversion to Chapter 7 the debtor owed Ms. Butner $218,254.23, and that she owed nothing to the debtor. The only other evidence in the record on that point is the self-serving testimony of Ms. Butner to that same effect.[4]

---

[4] William J. Lawing, an accountant hired by Mr. Butner to audit his client trust accounts, testified at trial that his audit revealed that Ms. Butner deposited $1,176,306.93 into her husband's trust account and that $506,371.45 of checks were written out of that account to her. Lawing's testimony is of little, if any, relevancy on the issue of whether Ms. Butner contributed more to the debtor than she received. It is again noted that the records of the trust account have been withheld from the trustee in bankrutpcy.

Reasonably equivalent value has not been shown for any part of the $95,500 in post-petition transfers just as none was shown for the $107,000 in post-petition transfers. While Ms. Butner claims to have purchased the debtor's trailers and leased them back, the observation of the bankruptcy court that there was virtually no evidence other than the Butners' "say so" to support that claim is a fit one.

The court is unable to find that the bankruptcy court erred in concluding that $95,500 of pre-petition transfers were fraudulent and avoidable pursuant to 11 U.S.C. § 548(a).

## III.  *Conclusion*

For all of these reasons, the judgment of the bankruptcy court is

*AFFIRMED*.