In re VALLEY STEEL CORPORATION, Debtor.

Donald W. HUFFMAN, Trustee, Plaintiff,

v.

NEW JERSEY STEEL CORPORATION, Defendant.

Bankruptcy No. 7–88–01453.
Adv. No. 7–93–00191A.

United States Bankruptcy Court,
W.D. Virginia, Roanoke Division.

June 7, 1995.

**730**

Howard J. Beck, Roanoke, VA, for trustee.

Susan Rhiel, Columbus, OH, for New Jersey Steel Corp.

## DECISION AND ORDER

ROSS W. KRUMM, Chief Judge.

This adversary proceeding involves two steel companies, Valley Steel, (herein "Valley") the Debtor in Chapter 7, and New Jersey Steel, (herein "NJS") a creditor of Valley and the transferee of payments on account of an antecedent debt owed by Valley. The Trustee filed this adversary proceeding alleging that Valley made preferential payments to NJS in violation of 11 U.S.C. § 547(b),[1] and that those payments should be recovered by the estate for the benefit of unsecured creditors. NJS concedes that the payments were preferential as defined by section 547(b) of the Bankruptcy Code, but raises the affirmative defense that the payments cannot be avoided because they were made in the ordinary course of business as defined by 11 U.S.C. § 547(c)(2). Stipulation B.5. For the reasons set out in this Decision and Order the court finds that some of the transfers are protected by the ordinary course of business exception and some of the transfers are not protected, and are therefore avoidable by the Trustee.

## FACTS

Valley was a steel fabricator engaged in the business of, among other things, buying long sections of steel reinforcing rods, known as "rebar," for use in construction projects. Valley would fabricate the stock rebar into usable sections by cutting it to length and bending it to the shapes required by its purchasers. Valley bought the stock rebar from various manufacturers, one of which was NJS.

Valley began its business relationship with NJS in 1987, when it made the first of many

---

1. 11 U.S.C. § 547(b) reads as follows:

... the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
 (A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under Chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

rebar orders.[2] From May 13, 1987 to June 3, 1987 Valley placed nine orders for rebar with a total value of $130,545.29. *See* Joint Ex. 34; Stipulation B.2. From that time until March of 1988, Valley placed no orders for rebar from NJS. On March 22, 1988, however, Valley again began to place orders for rebar from NJS. Between March 22 and April 14, 1988, the last order paid prior to the preference period, Valley ordered rebar from NJS with a total value of $98,811.31. *See* Joint Ex. 34; Stipulation B.2. Between April 14 and June 30, 1988, Valley ordered rebar with a total value of $313,056.02, payments on which resulted in the preferential transfers. *See* Joint Ex. 34; Stipulation B.3. Between June 30, 1988 and September 9, 1988, Valley ordered rebar with a total value of $48,972.54, payments for which are stipulated to be protected by the "new value" exception contained in 11 U.S.C. § 547(c)(1). Stipulation B.6. On September 9, 1988, an involuntary Chapter 7 petition was filed for Valley. The preference period ran from June 11, 1988, through September 8, 1988. Stipulation B.1.

By the Spring of 1988, Valley began to face financial difficulties of such seriousness that some of its suppliers refused to extend additional credit, requiring payment in cash before any order would be filled. Stipulation B.16. At about the same time, NJS decided to attempt to increase its business with Valley. Cumiskey Dep. at 5–6; Joint Ex. 52. By April, NJS and Valley agreed that NJS would supply approximately 40% of Valley's rebar needs. Joint Ex. 52, ¶ 5.

### Incurrence of the Debt

A large portion of the debt incurred by Valley to NJS that was paid during the preference period arose after a mistake made by the two companies. Stipulation B.20. In April or May of 1988, Valley sent an order to NJS for "six loads" or "six truck loads" of rebar. NJS filled the order as "six train car loads" of rebar, a significantly greater amount. Within NJS the order was ap-

proved at that level based on the mistaken assumption that the amount being approved was six truck loads. *See* Cumiskey Dep. at 12. The result of this order being filled was that Valley's account with NJS grew to $577,-820.80, exceeding Valley's $250,000.00 credit limit by $327,820.80, or 131%. Stipulation B.14. What began as a mistake, however, was later ratified by NJS when it continued to deal with Valley, filled Valley's orders, and did not immediately request additional security.

Throughout April and May, 1988, Valley placed numerous orders with NJS and the orders were all regularly filled. *See* Joint Ex. 34. On June 20 Marie Miller, credit coordinator at NJS, sent a memorandum to Colin Cumiskey, assistant treasurer at NJS, stating that she was concerned about the amount of credit that NJS had extended to Valley. Joint Ex. 53. According to the memorandum, she had been contacted by "Pete," a representative of Syosset Steel, a competitor of NJS, and one of the steel companies that no longer extended credit to Valley. Pete told Ms. Miller that Valley was in trouble, that it would eventually file for bankruptcy, and that Syosset was entering into litigation with Florida Steel, another competitor, against Valley. *Id.* In addition, he told her that Birmingham Steel is also "having trouble" with Valley and urged her to call James A. Franks, of Florida Steel. Ms. Miller recited that she did call Mr. Franks and that he indicated that Florida Steel had filed suit against Valley. In her testimony, Ms. Miller stated that Pete, of Syosset, suggested that NJS join with Syosset and Florida to file an involuntary bankruptcy against Valley. NJS did not join the other steel companies and was not one of the creditors who initiated the involuntary petition on September 9, 1988.

On July 8, 1988, Mr. Cumiskey sent a letter to Charles Oakey, Valley's President, requesting that Mr. Oakey sign a personal guarantee of the debt to NJS. Joint Ex. 54.

---

**2.** The parties stipulated that there were sixteen transactions between Valley and NJS prior to the preference period. Stipulation B.2. Nevertheless, at trial counsel for NJS adduced testimony indicating that there had, in fact, been orders by Valley from NJS prior to March, 1987, but that

records for the orders could not be located due to the lapse of time and NJS' internal policy of destroying records after seven years. With records unavailable, no documentary evidence was proffered showing the details of this prior course of dealing.

In the letter, Mr. Cumiskey refers to the "over–60 day" balances, saying that he would forego legal action to collect them if Mr. Oakey would personally guarantee the debt. It is notable that on July 8, 1988, none of the debt from Valley to NJS was more than sixty days old. The aged trial balance sheets placed in evidence by the parties show that on May 31 the 61–90 day column showed a balance of zero. Joint Ex. 45. On June 24 the 61–90 day column showed a balance of $74,872.06. Joint Ex. 46. On June 27 the 61–90 day column showed a balance of $71,-091.68. Joint Ex. 47. However, the aged trial balance sheet for June 30 again shows a zero balance in the 61–90 day column. Joint Ex. 48. This state of facts is further supported by examining the date of each invoice and the date on which payment was made. Joint Exhibit 34 indicates that all of Valley's "over–60 day" balances were retired by July 1, 1988. It appears from this that the July 8 letter may have been inaccurate and that on the date it was signed there were no "over–60 day" balances. This incongruity may be explained by the fact that on June 24, close in time to Marie Miller's June 20 memorandum to Mr. Cumiskey, some balances were in the 61–90 day range. It is possible, therefore, that the information contained in Mr. Cumiskey's letter to Mr. Oakey was "aged" back to June 24 and no longer current on July 8. Although no guarantee was ever executed, NJS continued to fill Valley's orders throughout the Summer of 1988. Mr. Cumiskey testified that he would have sought a personal guarantee from Valley's principal if he had been aware that the mistaken large order of steel would make Valley exceed its credit limit by such a large amount. Cumiskey Dep. at 12. Nevertheless, the evidence indicates that no such guarantee was sought at the time the orders were placed or the mistake discovered.

Later in the Summer of 1988, through July, August, and the beginning of September, Valley continued to place orders for rebar and NJS continued to fill them. However, by the end of the August, Valley had not made a payment to NJS for its April and May orders since July 26. On August 29, 1988, NJS began to take legal action against Valley when it retained attorney William

Maxwell to collect the remainder of Valley's debt to NJS. Joint Ex. 55. After this time, two more payments were made to NJS on September 8 and the involuntary Chapter 7 petition was filed on September 9, 1988, by Florida Steel, Syosset Steel, and Birmingham Steel. Stipulation B.1; Involuntary Bankruptcy Petition.

### Collection Practices

Marie Miller testified on behalf of NJS as to the methods she used as credit coordinator to collect outstanding accounts. She stated that the primary means of encouraging payments was the use of telephone calls to those whose accounts had reached a certain level of aging. Exactly how many days late an account would have to be to trigger a phone call from her was the subject of some dispute. She testified that in 1994 she would begin to make telephone calls on an account after the passage of about 45 days. When she called she would inquire if and when a check had been sent, or when one could be expected. In 1988, however, her collection practices were different, as the market was different then. Then she would not begin to call until about 60 days had passed. On cross examination she limited her statement somewhat when she was reminded of the testimony she gave at her deposition. Then she said that in 1988 she would begin to call after approximately 45 days. Finally, she concluded that there was no set amount of time, but rather a range between 45 and 60 days. In addition, in her deposition testimony she stated that by the time an account had a balance that was between 60 and 90 days old she would have been "calling and calling and calling as a general practice on [the] account." Miller Dep. at 28. In sum, her testimony was uncontroverted that NJS' typical practice was to use telephone calls as the method of collecting on all accounts that aged to a certain point. It was a bit unclear what that age was, but it falls in the range of 45 to 60 days. Ms. Miller testified that the standard and only collection practice used by NJS was to send an invoice and then make follow-up telephone calls.

Ms. Miller also had partial responsibility for setting credit limits for NJS' customers. She testified that these were based on little

more than an educated guess of what the customers could pay and what their future needs would be. When a customer needed to exceed its credit limit it was the standard practice that such an extension would be summarily approved. Miller Dep. at 23; Cumiskey Dep. at 7–8.

**History of Payments From Valley to NJS**

A review of the pattern of payments from Valley to NJS reveals several important facts. Checks for payments on all of the transactions prior to the preference period were honored [3] an average of 54.38 days after the date of the invoice. The number of days ranged from 36 to 75. Checks for payments on all of the transactions that resulted in preferential transfers were honored an average of 67.18 days after the date of the invoice. For all transactions between NJS and Valley, the number of days between invoice and payment by the bank ranged from 26 to 119.

During the preference period there were four transfers that merit some additional attention. The first was a wire transfer to NJS dated June 29, 1988, and made 55 days after the May 5 invoice date. This transfer is of note because there is no evidence of any other wire transfers from Valley to NJS. The second was a check honored on July 26, 1988, 26 days after the June 30 invoice date. The third and fourth were checks honored on September 7, two days before the filing of the involuntary petition, and 119 days after the May 10 transfer date. The July 26 check was significantly shorter than, and the September 7 checks significantly longer than, the normal transaction time between the parties. In addition, expert testimony established that the time frame on these checks was outside the industry norm. *See* Expert Testimony, *infra.*

**Sales Terms**

The parties stipulated that the standard sales terms used by NJS, along with most others in the steel rebar manufacturing industry, were "one percent ten net thirty days." Stipulations B.9—B.12. Despite the

existence of standard terms, the parties also stipulated that others in the industry typically do not comply with these terms and thus pay later than thirty days after the invoice date. Stipulation B.13. In addition to these stipulations, both parties provided expert testimony as to the time it usually takes in the steel manufacturing industry for payments to be received on invoices with the terms "one percent ten net thirty days."

**Expert Testimony**

On behalf of the Trustee, James A. Franks, corporate credit director of Florida Steel, provided expert testimony on the length of time it usually takes for rebar manufacturers to be paid by rebar fabricators who order product. He stated that the average in 1994 was 41 days for sales from a manufacturer to a fabricator. He cited to the National Association of Credit Management (NACM) figures for "mini-mills," the category that describes manufacturers like Florida and NJS. NACM's survey of credit managers indicated that the average time from invoice to payment was 40.37 days. Joint Ex. 57. No NACM figures were provided for 1988, however. The information provided by the Trustee regarding 1988 was Mr. Franks' various estimates that in 1988 payments were received "within a day or two" of when they are in 1994, that they were in the 40 to 45 day range, and that they averaged 45 days. *See* Franks Dep. at 28–31 and 46.

On cross examination, and over the Trustee's objection, counsel for NJS elicited Mr. Franks' testimony regarding another bankruptcy case in which he testified. *See* Franks Dep. at 56–63. That case was *Stober v. Florida Steel Corp. (In re Industrial Supply Corp.),* 109 B.R. 484 (Bankr.M.D. Fla. 1990), *aff'd* 961 F.2d 1582 (11th Cir.1992), and Mr. Franks testified as a witness for Florida Steel. A chart that is very much like the one provided here as Joint Exhibit 34 was reprinted in the opinion to show invoice dates and amounts, and the date payments were issued. According to Mr. Franks' de-

---

**3.** The parties agree that the crucial date for purposes of determining which payments were made within the preference period is the date a check is honored, or paid, by the bank. In this Decision and Order, the figure for the number of days after the invoice will be based on the date of honor, unless otherwise specified.

position, it was prepared by counsel for Florida Steel with Mr. Franks' assistance. Franks Dep. at 59. That chart shows that, on net thirty days payment terms for sales from Florida Steel to the debtor, payments prior to the preference period averaged 59.3 days after the invoice date. Payments made during the preference period averaged 70 days after the invoice date.[4] *Industrial Supply,* 109 B.R. at 488.

Matt DePalo testified as an expert witness on behalf of NJS and gave his assessment of the time it typically takes fabricators in the steel industry to pay manufacturers who supply them with rebar. DePalo is chief financial officer of Barker Steel, a fabricator of steel with operations and business very similar to Valley and that orders 70% to 75% of its steel from NJS. He testified that, based upon a survey of his own records for payments to four steel manufacturers, in 1994 Barker took anywhere from 40 to 70 days to pay manufacturers, with the average being approximately 50 days. DePalo Dep. at 54–55. In 1988, the time it took for Barker to pay each steel manufacturer for rebar ranged from 32 to 120 days after the invoice date. DePalo Dep. at 17. Mr. DePalo testified that the average payment in 1988 would have been received approximately 10 to 15 days later than in 1994. DePalo Dep. at 23. Mr. DePalo also testified that NJS, with which Barker has dealt for over 20 years, is, in his opinion, more lenient with its credit terms than other steel manufacturers. DePalo Dep. at 27.

## LAW & DISCUSSION

In this case the Trustee and NJS have stipulated that the transfers at issue were preferential, as defined by section 547(b) of the U.S. Bankruptcy Code. Therefore, the only issue for decision is whether or not the preferential transfers satisfy the ordinary course of business exception contained in section 547(c)(2). That section reads as follows:

The trustee may not avoid under this section a transfer—to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The burden of proving this defense is on the transferee asserting it. 11 U.S.C. § 547(g). Proof of the defense must be by a preponderance of the evidence. *Miller & Rhoads v. Abbey (In re Miller & Rhoads),* 153 B.R. 725, 727–28 (Bankr.E.D.Va.1992).

The purpose of section 547(c)(2) is stated in the legislative history as follows:

The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978). Case law has expanded on this explanation. "The ordinary course of business exception found in section 547(c)(2) contemplates normal credit transactions such as the sale of goods from a business supplier...." *Evans Temple Church of God in Christ and Community Center, Inc. v. Carnegie Body Co. (Matter of Evans Temple Church of God in Christ),* 55 B.R. 976, 984 (Bankr.N.D. Ohio 1986).

*I. Section 547(c)(2)(A): Debt Incurred in the Ordinary Course*

To satisfy section 547(c)(2)(A), the transferee must show that the debt at issue was incurred in the ordinary course of business of the debtor and the transferee. This "contemplate[s] a subjective test: Was the debt and the transfer ordinary as between the debtor and the creditor? To be subjectively

---

**4.** It should be noted that the *Industrial Supply* case involved different steel products than the type of rebar at issue in this case, which NJS manufactured and sold to Valley. Franks Dep. at 58.

ordinary implies some consistency with other business transactions between the parties." *Huennekens v. Marx (In re Springfield Contracting Corp.),* 154 B.R. 214, 222 (Bankr. E.D. Va.1993) (citation omitted).

■ As compared to other areas of preference law, there is scant case law on the issue of whether or not a debt has been incurred in the ordinary course of business between the debtor and the transferee. What case law there is reveals that courts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or whether it was incurred as an insider arrangement with a closely-held entity. For instance, *McCullough v. Garland (In re Jackson),* 90 B.R. 793 (Bankr.D.S.C.1988), involved a debtor who directed that a part of his inheritance from his mother be paid to his mother-in-law on account of an antecedent debt owed to her. The debtor's mother-in-law had loaned him $60,000.00 to assist him in the operation of his business. *Id.* at 793–94. When the trustee sought to recover the payment, the mother-in-law argued that she should be protected by the ordinary course of business exception. The court disagreed, however, finding that the debt was not incurred in the ordinary course of business because the mother -in-law was not in the business of lending money and she had never loaned money to the debtor in the past. *Id.* at 797. A similar outcome obtained in the case of *Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.),* 107 B.R. 698, 702 (9th Cir. BAP 1988). There, the transferee, a significant stockholder of the debtor corporation, made short-term loans to cure capitalization shortfalls. The court held that the debts that arose from these loans were not debts incurred in the ordinary course of business. *Id.* at 702. In *Springfield Contracting, supra,* the debtor, a corporation, had paid money to a person who was both a manager and director, allegedly to repay debts incurred on behalf of the corporation. The court found, however, that there was insufficient evidence that a debt actually was incurred for the corporation, and thus found that it could not be in the ordinary course. *Springfield Contracting,* 154 B.R. at 222–224.

By contrast, other courts have had no trouble finding that common commercial transactions result in debts incurred in the ordinary course. In *In re Magic Circle Energy Corp.,* 64 B.R. 269, 273 (Bankr.W.D. Ok.1986), the court found that a refinance of payment terms on a debt, the underlying character of which was also ordinary, did not defeat the requirement of subsection (c)(2)(A). *Id.* at 273. *See also Kellman v. P.S.E. & G. (In re Jolly "N," Inc.),* 122 B.R. 897 (Bankr.D.N.J. 1991) (payments on account of accrued debts for utilities are transfers in payment of debts incurred in the ordinary course of business).

■ The simplest way to state the meaning of subsection (c)(2)(A) is contained in *Campbell v. Cannington (In re Economy Milling Co., Inc.),* 37 B.R. 914 (D.S.C.1983), which states as follows:

> Since this showing [that the transaction is ordinary] is required merely to assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors, an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary.

*Id.* at 922. Thus, a first time transaction is no less susceptible of qualifying for the ordinary course of business exception than a transaction that has occurred frequently in the past. *Gosch v. Burns (In re Finn),* 909 F.2d 903, 908 (6th Cir.1990). It need only be true that the transaction was of a type that would not be out of the ordinary for similarly situated parties. *Id.*

■ In this case the Trustee attempts to carve out the mistaken order from section 547(c)(2)(A) because it was much larger than previous orders and resulted in the debtor exceeding the credit limit that NJS had established. But, upon discovery of the mistake, NJS and the Debtor proceeded with their business relationship. NJS accepted the increase in credit and continued to ship. Its action is consistent with Mr. DePalo's testimony that NJS was lenient with credit terms. Also, Ms. Miller testified as to NJS' flexibility in establishing and extending credit limits. Finally, the parties agree that "[i]t

was not unusual in the industry for substantial purchases to be made at one time given the nature of the fabricating business." Stipulation B.15. All of these facts point toward a debt incurred in the ordinary course.

In this case the parties entered into a transaction through mutual mistake of fact. Rather than rescind, the parties elected to carry out the terms of the agreement. This is indicative of the understanding of the parties to treat the transaction as ordinary. Also, the agreement to continue was at arms length between two independent commercial entities in the marketplace. There is no evidence that ratification after discovery of the mistake was utilized to give NJS an advantage over other creditors. Ratification of an agreement borne of mutual mistake of fact may not be common, but in the context of this case it was ordinary as that term is defined by *Campbell v. Cannington (In re Economy Milling Co., Inc.), supra.* NJS has proven section 547(c)(2)(A).

## II. Section 547(c)(2)(B): Payment Made in the Ordinary Course

■ The determination of whether a payment was made in the ordinary course of business requires the court to "engage in a 'peculiarly factual' analysis of the business practices which were unique to the particular parties under consideration." *Gosch v. Burns (In re Finn),* 909 F.2d at 907; *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir.1989). "[T]he cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor." *In re Magic Circle Energy Corp.,* 64 B.R. at 273. Thus, the relevant question is not whether the transactions were ordinary with respect to some objective standard in the industry, but whether they were "consistent with the course of dealings between the particular parties." *Yurika Foods,* 888 F.2d at 45. In

examining course of dealing, the *Yurika* court stated that "courts examine several factors, including timing, the amount and manner a transaction was paid [sic] and the circumstances under which the transfer was made." *Id.* Other courts look to factors such as the past payment history of the debtor to the creditor and the timeliness of payments; [5] the existence of any unusual debt collection practices; [6] and changes in the means of payment. [7]

On the timeliness of payments factor, there is a split of authority as to when lateness of payments will take a preferential transfer out of the ordinary course of business exception. One view is that expressed by the court in *Gold Coast Seed Co. v. Beachner Seed Co. (Matter of Gold Coast Seed Co.),* which held that a payment made six days after the date required by the invoice was *per se* out of the ordinary course of business. *Gold Coast Seed Co.,* 24 B.R. at 597. Another view was expressed by this court in *Leake v. Nicol (In re Matters),* 99 B.R. 314 (Bankr.W.D.Va. 1989). There the debtor had historically made payments at varying times, but never within the ten days allowed under the sales contracts. The court held that, since the debtor and creditor had an extensive history of such payments being paid more than 30 days after they were due, the ordinary course of business exception was still applicable. This view was also taken in *Stober v. Florida Steel Corp. (In re Industrial Supply Corp.),* 109 B.R. 484 (Bankr.M.D.Fla.1990). There the court held that, on net 30 day terms, payments during the preference period that were made 70 days after the invoice date were not out of the ordinary when compared with payments prior to the preference period that were made 59.3 days after the invoice date.

■ The court rejects the *per se* rule laid down in *Gold Coast, supra,* because such a bright line rule ignores the realities of com-

---

5. *Stober v. Florida Steel Corp. (In re Industrial Supply Corp.),* 109 B.R. 484 (Bankr.M.D.Fla. 1990); *Gold Coast Seed Co. v. Beachner Seed Co. (Matter of Gold Coast Seed Co.),* 24 B.R. 595 (9th Cir. BAP 1982).

6. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1566 (11th Cir.1986).

7. *Id.* (payment by cashier's check not ordinary when payments had historically been by corporate check).

mercial practice in the industry involved in this case and because it fails to give due consideration to the purposes that the ordinary course of business exception is designed to serve. The rationale used in *Stober v. Florida Steel Corp. (In re Industrial Supply Corp.)* and *Leake v. Nicol (In re Matters)*, *supra*, is better suited to this case. Therefore, the touchstone for decision is the payment history between the parties and the timing of payments both prior to and during the preference period.

■ The facts of this case show that payments prior to the preference period were made an average of 54.38 days after the date of the invoice. During the preference period payments were made an average of 67.18 days after the date of the invoice. If timeliness of payments is determined solely on the basis of comparison of average days before and during the preference period, the difference in this case is not so significant as to defeat the ordinariness of all the payments. The evidence in this case reflects a time range consistent with other case law that indicates that a narrow band of difference is acceptable. *See Industrial Supply Corp., supra; Warren v. Society Corp. (In re Perks)*, 134 B.R. 627, 632 (Bankr.S.D. Ohio 1991) (payments during the preference period made 10 to 20 days late were ordinary when compared with pre-preference period payments made 9 to 20 days late); *Sprowl v. Miami Valley Broadcasting Corp. (In re Federated Marketing, Inc.)*, 123 B.R. 265 (Bankr.S.D. Ohio 1991) (payments during preference period made 79 to 101 days after invoice not in ordinary course when compared to pre-preference period payments made 33 to 46 days after invoice).

However, an analysis of individual payments shows that there were four payments that do not appear ordinary because they deviate substantially from the average both before and during the preference period. Of the last three payments made during the preference period, check number 5798, honored July 26, 1988, was 26 days after the date of the invoice. The other two, check

numbers 5953 and 5954, both honored September 7, 1988, were 119 days after the date of the invoice. *See* Joint Exs. 15, 17, 18, 31, 32, and 34. These payments are not consistent with the parties' practice either during or before the preference period and the court finds that they are not payments made in the ordinary course of business between NJS and Valley.

■ A fourth payment of $6,969.67 was made by wire transfer for invoice number 76420 on June 29, 1988. Joint Exs. 6, 24, and 34. No evidence was presented that a payment by wire transfer was ever part of the practice between Valley and NJS. In fact, all of the evidence was that payments were made by ordinary company check. Clearly, this method of payment was not consistent with the practice of the parties. Accordingly, the court finds that this payment was not made in the ordinary course of business.

■ The Trustee argues that seven payments made after July 8, 1988, were made in response to creditor pressure.[8] Any payment that was made in response to unusual creditor pressure is made out of the ordinary course. *See Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d at 1566; *O'Donnell v. ProGroup, Inc. (In re Bob Grissett Golf Shoppes, Inc.)*, 78 B.R. 787 (Bankr. E.D.Va.1987) (preferential payments avoidable when made while creditor had knowledge of debtor's financial difficulties and creditor threatened to discontinue product shipments if debt not liquidated and retired quickly); *Miller & Rhoads, Inc. v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.)*, 153 B.R. 725 (Bankr.E.D.Va.1992) (preferential payments avoidable where collection efforts resulted in weekly "payment plan" to retire outstanding balance and check postdated and held until debtor could cover).

In *Craig Oil, supra*, the debtor and creditor had a pre-preference history of payments generally being on time. During the preference period this practice continued and payments were made on time. The court was concerned, however, with the fact that the

---

8. Three of these payments were by checks numbered 5798, 5953, and 5954, referenced above, which the court has found to be payments not in

the ordinary course because of the timeliness factor.

creditor had pressured the debtor to make "a show of good faith" by paying in collected funds. The debtor did so, thereafter paying by cashier's check. The court held that payments by cashier's check were avoidable, stating as follows:

§ 547(c)(2) should protect those payments which do not result from 'unusual' debt collection or payment practices. To the extent an otherwise 'normal' payment occurs in response to such practices, it is without the scope of § 547(c)(2). Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

*Marathon Oil v. Flatau (In re Craig Oil)*, 785 F.2d at 1566.

 In this case, the facts show that the standard means of collection used by NJS was the telephone call and that telephone calls were, with one exception, the exclusive method. The one exception is a letter dated July 8, 1988, from Colin Cumiskey to Charles Oakey seeking Mr. Oakey's personal guarantee of the debt to NJS. Joint Ex. 54. This is clearly the kind of nonordinary collection method with which the court must concern itself. The question that must be answered is whether this letter had the intended effect. The parties stipulated that no personal guarantee was ever signed, so it was not effective in that respect. Stipulation B.22. Joint Exhibit 34 reveals that seven checks were honored after July 8, having a total value of $86,622.23. The Trustee argues that the proximity of the payment of the checks to the July 8 letter is evidence of payment in response to creditor pressure. However, an examination of the checks, themselves, indicates that four of them were actually dated on or before July 8. Two checks, numbers 5735 and 5739, bear the date July 7. These checks were deposited by NJS on July 11, and honored on July 12. Joint Exs. 12 and 13. Two other checks, numbers 5741 and 5742, bear the date July 8. These checks were deposited by NJS on July 13, and honored on July 14. Joint Exs. 14 and 16. The letter from Mr. Cumiskey was dated July 8 and there is no evidence as to

how or when it was sent to Mr. Oakey. *See* Joint Ex. 54. Further, there is no evidence as to when the letter was received. However, absent proof to the contrary, common sense dictates that the letter was received sometime after July 8. Therefore, it is more likely than not that the four checks referenced above were written and sent to NJS before Valley knew the content of the July 8 letter. The court finds that these four checks were not sent as a result of nonordinary collection efforts and that they were payments made in the ordinary course of business between NJS and Valley.

### III. Section 547(c)(2)(C): Payment Made According to Ordinary Business Terms

 Until the recent Fourth Circuit decision in *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir.1994), *see infra*, it was said of section 547(c)(2)(C) that:

Neither a perfunctory survey of the bare language of § 547(c)(2), nor a careful, resolute stare, would lead the average reader to an appreciable understanding of what subsection C adds to subsections A and B in § 547(c)(2).

*Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 223 (3d Cir.1994). *Advo–System v. Maxway* draws from the reasoning used in the Third and Seventh Circuits to arrive at its interpretation of subsection (C). Industry norm is the starting point for analysis of this subsection.

In the Seventh Circuit, *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir. 1993), involved a debtor in possession who operated a pizza restaurant and purchased large quantities of sausage from the transferee. In its transactions with most of its customers, the transferee received payments after approximately 21 days, even though the invoices stated terms of net seven days. In the 34 months prior to the preference period, the debtor paid the transferee after an average of 26 days, and during the preference period the debtor paid after an average of 22 days. The court, after considering the purposes of the preference avoidance section, noted that "a 'late' payment really isn't late if

the parties have established a practice that deviates from the strict terms of their written contract." *Id.* at 1032. The court reasoned that parties to business transactions frequently will establish a practice of conducting business in a way that varies from the explicit terms of their written agreements. The court also stated that it could not abandon its independent judgment to the parties' conduct. Otherwise a creditor who knows of the debtor's distress and of the possibility of a bankruptcy petition, would likely set terms that vary from the industry norm to protect its interest in being paid more effectively than had those other creditors who dealt with the debtor during happier times. This is exactly the sort of situation that the avoiding power is meant to address. Accordingly, the *Tolona* court held that:

> 'ordinary business terms' refer to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Id.* at 1033. *Tolona Pizza* stands for the proposition that reasonable deviations within the range of payment periods for a particular industry will satisfy the ordinary business terms test.

In the Third Circuit, *Molded Acoustical* involved a trade creditor of the debtor's which received preferential payments during the 90 days preceding the bankruptcy filing. The court adopted the holding of *Tolona Pizza* that the court should compare the past practice between this creditor and this debtor with the industry range, but added that, if there has been a long relationship between the parties, greater variance from industry norms would be permissible:

> [T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2).

*Molded Acoustical,* at 225.

The court in *Molded Acoustical* set out a three-step analysis. First, the court must look to the range of terms that firms like the transferee use with firms like the debtor. Second, the court must look to the actual relationship between this transferee and this debtor to determine the extent to which their conduct conforms to the industry norm. Third, the court must determine how stable and constant was the conduct of this transferee and this debtor to identify if there was any change in the way business was conducted during the preference period, as compared to the pre-preference period. The facts in *Molded Acoustical* showed that 1) the record contained scant evidence of industry norms, 2) the terms used by the debtor and transferee required payment within 40 to 45 days of the invoice, but their actual practice in the preference period showed payments arriving an average of 89 to 99 days after the invoice, and 3) prior to the preference period, the debtor took an average of 58 days to pay the invoices, and during the preference period the transferee attempted to put the debtor on a payment plan. The court held that the dispositive fact was

> the evidence that the terms dominating throughout the pre-insolvency relationship between the parties (58 days) were far shorter than the preference-(insolvency-) period payment terms (89 days). Moreover, [there is] evidence that [the transferee] altered its collection practices within the preference period in several ways besides its extension of the debtor's repayment period [by instituting a payment plan and pressuring the debtor to increase its payments].

*Id.* at 228.

The Fourth Circuit developed a single rule in *Advo–System, Inc. v. Maxway Corp.* Adopting the reasoning in *Tolona Pizza,* as embellished by *Molded Acoustical,* the court held that a sliding scale approach would be used to determine whether or not the transactions between the debtor and transferee were consistent with industry norms.

> A 'sliding-scale window' is thus placed around the industry norm. On one end of the spectrum, '[w]hen the relationship between the parties is of recent origin, or formed only after or shortly before the

debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry.' In such a case, only those 'departures from [the] relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection.'

*Id.* at 1049 (citations omitted) (citing *Molded Acoustical,* at 225–226). When the debtor and transferee have had an enduring relationship, on the other hand, then their customary terms may depart substantially from the norm in the industry, so long as it dos not "depart so grossly from what has been established as the pertinent industry's norms that they cannot be seriously considered usual and equitable with respect to the other creditors." *Id.* (citing *Molded Acoustical,* at 226).

The emphasis on the duration of the parties' relationship serves to effectuate the two major policies of the law of preferences. By offering some protection to creditors who are willing to deal with troubled businesses, the possibility of survival will increase for businesses that are on the edge of bankruptcy, but still susceptible to resuscitation. Moreover, the likelihood of undiscovered overreaching by a preferred creditor is minimized if an enduring relationship is available to compare with the creditor's conduct during the preference period. Conversely, where the relationship is short, the terms must be consistent with the objective norms of the creditor's industry to avoid the appearance and risk of favoritism.

▪ The parties stipulated here that the standard terms in the industry for sales from rebar manufacturers to rebar fabricators were "one percent ten net thirty days." Stipulation B.9. The parties also agreed that the average practice in the industry is that invoices are not paid within thirty days. Stipulation B.13.

The testimony from the Trustee's expert witness, James A. Franks, was that in 1994 it took steel fabricators an average of 40.37 days to pay "mini-mill" manufacturers, the category that he said describes NJS. Franks Dep. at 28; Joint Ex. 57. Mr. Franks testified that in 1988 payments were made "within a day or two" of when they were 1994 and that they averaged approximately 45 days. Franks Dep. at 29 and 46. He also agreed that the market was more competitive in 1988 than it was in 1994 and that payments would have taken longer then than in 1994. Franks Dep. at 29. Upon further examination, Mr. Franks revealed that he had been involved in the bankruptcy case of Industrial Supply Corp., where he testified on behalf of Florida Steel, his employer. Franks Dep. at 56; *see Stober v. Florida Steel Corp. (In re Industrial Supply Corp.),* 109 B.R. 484 (Bankr.M.D.Fla.1990). In that case the evidence showed that Florida Steel, a manufacturer similar to NJS, had been the steel supplier for a wholesale distributor of industrial hardware, steel, and steel products. *Id.* at 485. The evidence of payment times, which was prepared for the court by Mr. Franks and his counsel, Franks Dep. at 59, indicated that payments on net thirty day terms were made in the pre-preference period an average of 59.3 days after the invoice date, and in the preference period an average of 70 days after the invoice date. *Id.* at 488.

The testimony of Matt DePalo, the expert for NJS, was that the average time it took for manufacturers to be paid by fabricators in 1994 was between 40 and 70 days, with the average being approximately 50 days. Mr. DePalo also testified that the average in 1988 was approximately 10 to 15 days longer than in 1994, due to different market conditions. DePalo Dep. at 23. Marie Miller, credit coordinator at NJS and also an expert on credit terms in the steel industry, agreed with these figures and testified in court that payments in 1988 were received after a longer time than they were in 1994, as the market then was more competitive.

The court has evaluated all of the expert testimony as to industry standard and concludes that the time frames in this case, which averaged approximately 54 days during the pre-preference period and 67 days during the preference period, were sufficiently consistent with the terms generally used in the industry. The *Advo–System v. Maxway* case requires the court to demand stricter adherence to the industry standard when the

relationship between transferor and transferee is of a short duration. The relationship here lasted at least one and one-half years prior to the bankruptcy filing. There is no evidence as to whether this period constitutes a short or long duration within the steel industry. However, even if that period is considered so short that stricter adherence is required, the facts here show sufficient consistency with the industry practice to satisfy the requirements of section 547(c)(2)(C). On the other hand, if one and one-half years is considered to be a longstanding relationship, then the time for payment between the pre-preference and preference periods presents only a minimal deviation. From either perspective, NJS has carried its burden of showing that the terms of the transactions were ordinary with respect to others in the same industry.

## CONCLUSION

For the foregoing reasons, it is

## ORDERED:

That the complaint to avoid preferential payments made by Valley Steel to New Jersey Steel be, and it hereby is, DENIED in part and GRANTED in part, as set out below. The Trustee shall recover the following four payments as preferential transfers:

| Invoice No. | Check No. | Amount |
| --- | --- | --- |
| 76420 | Wire | $ 6,969.67 |
| 78863 | 5798 | $ 6,969.67 |
| 76624 | 5953 | $15,000.00 |
| 76624 | 5954 | $ 7,590.11 |

### FURTHER ORDERED:

That JUDGMENT is granted to the Trustee against New Jersey Steel Corporation in the amount of $36,529.45, together with interest at the federal judgment rate from September 16, 1993, until paid in full.