**In re C.W. MINING COMPANY, Debtor.**

**Kenneth A. Rushton, Trustee, Plaintiff–Appellant,**

**v.**

**SMC Electrical Products, Inc. and Becker Mining America, Inc., Defendants–Appellees.**

**BAP No. UT–13–026.**
**Bankruptcy No. 08–20105.**
**Adversary No. 10–02758.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Nov. 5, 2013.

Michael N. Zundel (Daniel C. Dansie, Idaho Falls, ID, and Callie Buys, Salt Lake City, UT, with him on the brief), of Prince, Yeates & Geldzahler, Salt Lake City, UT, for Plaintiff–Appellant.

Jeffrey L. Shields (Jacob D. Lyons with him on the brief), of Callister Nebeker & McCullough, Salt Lake City, UT, for Defendants–Appellees.

Before CORNISH, KARLIN, and ROMERO, Bankruptcy Judges.

OPINION

KARLIN, Bankruptcy Judge.

This case poses the question, "how ordinary is ordinary?" The ordinary course of business defense, set out in 11 U.S.C. § 547(c)(2)(A), protects the creditor of a debtor who has filed bankruptcy from an action by a trustee to recover, as a preference, payments made by the debtor prior to bankruptcy as long as the creditor can meet two requirements. First, the creditor must show that the alleged preferential payment was made "in payment of a debt incurred by the debtor in the ordinary course of business" of the debtor and the creditor. The creditor must then also show that the payment itself was "made in the ordinary course of business" of the debtor and the creditor.

This appeal is from a bankruptcy court order applying the ordinary course of business defense to a payment made by Debtor C.W. Mining Company ("C.W. Mining") to Creditor SMC Electrical Products, Inc. ("SMC") within 90 days of C.W. Mining being placed in involuntary bankruptcy. The Chapter 7 Trustee challenged the payment as a preferential transfer, but after full discovery, the bankruptcy court granted SMC's motion for summary judgment based on unchallenged material facts that it held demonstrated SMC was entitled to the ordinary course of business defense.

The Trustee/Appellant argues that the bankruptcy court erred in both its conclusions that: (1) the debt between SMC and C.W. Mining was *incurred* in the ordinary course of business of SMC and C.W. Mining, and (2) the debt payment that the

Trustee seeks to avoid was *a payment made* in the ordinary course of these two businesses. We conclude both that C.W. Mining incurred the debt from SMC in an effort to increase the production of its coal mining operations, which was C.W. Mining's primary business, and that the transaction was a typical arms-length creation of debt on the open market. The bankruptcy court did not err when it found that the debt was incurred in the ordinary course of business. In addition, the evidence supports the bankruptcy court's finding that the challenged debt payment was made in the ordinary course of both businesses. Applying the clearly erroneous standard of review, the bankruptcy court had adequate factual support in the record to conclude that SMC carried its burden of proof to show that the debt payment was incurred and made in the ordinary course of both businesses. As a result, we AFFIRM.

## I. Background Facts and Procedural History

The following facts were established by an affidavit filed by SMC, which the Trustee essentially elected not to challenge. In mid–2007, C.W. Mining sought to purchase a longwall electrical system from SMC.[1] Before then, C.W. Mining had engaged in continuous mining, a form of coal mining that is different from the longwall mining method.[2] Presumably to reduce its costs of engaging in this new method of coal mining, C.W. Mining elected to purchase previously scrapped equipment and to then refurbish that equipment for a new longwall system. C.W. Mining anticipated that

---

1. A longwall electrical system is part of the implementation of a longwall mining system, a form of underground coal mining where a long wall of coal is mined in a single seam. *See Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n,* 519 F.3d 1176,

1178 (10th Cir.2008) (describing operation of a longwall mine).

2. The Trustee freely admitted at oral argument that both methods of mining result in the production of coal.

the longwall system would increase its coal production by four or five times.

In June 2007, SMC and C.W. Mining agreed that SMC would provide C.W. Mining the equipment, service, and training for a longwall electrical system. The provision of longwall electrical controls, and the service and training on longwall electrical systems, are within the normal scope of products and services that SMC provides. In July 2007, SMC provided C.W. Mining with a quotation (Quotation 70312.3) that reflected the June 2007 agreement. Prior to the 2007 purchase, C.W. Mining had no relationship of any kind with SMC.

Quotation 70312.3 did not specify due dates for payments by C.W. Mining, but it did provide that additional charges could be applied to any amount not paid within thirty days of the invoice date. In addition, Quotation 70312.3 required progress payments as follows: 15% due within 7 days, 25% due upon issuance of submittals, 25% due upon release of manufacturing, 25% due upon completion of testing, and 10% due upon completion of commissioning. The payment terms between SMC and C.W. Mining were typical of the progress payment terms SMC had with its other customers. This "pay as you go" or "progress payment" schedule was typical for longwall system purchases at the time.

On September 18, 2007, SMC issued to C.W. Mining an invoice for $805,539.75, representing the cost of the majority of the equipment and services it had provided or was to provide. That invoice, as well as other invoices SMC issued to C.W. Mining, indicated the terms of payment as "special," to reflect the fact that C.W. Mining was to make progress payments as it received invoices from SMC. Although the Trustee argues the term "special" is itself reflective that this transaction was not "ordinary," he introduced no expert or other testimony in opposition to demonstrate that this term meant anything other than what SMC claimed.

For its customers, like C.W. Mining, who were making progress payments, SMC prepared and maintained two different sets of invoices, one internal and one external. The internal invoices were used for internal accounting purposes only, and were not typically issued to a customer. On October 16, 2007, C.W. Mining made payment by wire transfer, in the amount of $200,000, on the September 18, 2007 external invoice. SMC credited this payment to its internal invoice.

The October 2007 payment was one of five wire transfer payments made between September 27, 2007 and October 23, 2007, and applied to the September 18, 2007 invoice. The five payments came from three different sources: C.W. Mining's own account, the account of C.W. Mining's accounts payable service provider, and the account of Standard Industries, another company doing business with C.W. Mining, using proceeds from the coal mined by C.W. Mining. It was not unusual for SMC's customers to make multiple payments on a single invoice, particularly when an invoice exceeded $250,000. It was also not unusual for SMC to receive payment from entities affiliated with or directed by its customers. Other than the terms of the purchase contract between SMC and C.W. Mining, SMC was not aware of how or why C.W. Mining decided to make multiple payments on the September 18, 2007 invoice. Further, SMC had no knowledge of how or why C.W. Mining decided to have payments made to SMC from multiple entities.

The payment C.W. Mining made in October 2007 was made twenty-eight days after SMC issued the September 18, 2007 invoice. In SMC's experience, payment within this time frame was typical for its

customers. Further, other than its original agreement with C.W. Mining, SMC did not provide any instructions to C.W. Mining or its representatives or affiliates regarding the form, manner, or time of payments on the longwall electrical system. SMC also made no demands upon C.W. Mining of any kind related to payment. In addition, SMC is not aware why or how decisions were made by C.W. Mining regarding the manner, form, and timing of payments to SMC.

The bankruptcy court specifically found that neither early payment nor partial payment was inconsistent with the agreement SMC and C.W. Mining had made. The bankruptcy court also found that the October 2007 payment was made in accordance with the longwall system purchase agreement between SMC and C.W. Mining. Finally, the bankruptcy court found that SMC did not engage in any coercive collection activity with regard to the October 2007 payment.

On January 8, 2008, several months after C.W. Mining had purchased the longwall electrical system from SMC and just under 90 days since it made the October 2007 payment, C.W. Mining was involuntarily placed into bankruptcy. The involuntary bankruptcy was precipitated by a judgment obtained by Aquila, Inc. against C.W. Mining on October 30, 2007.[3] Although C.W. Mining remained in the Chapter 11 bankruptcy for some time, the case was later converted to Chapter 7.

The parties have never disputed that the transfer was a preference, instead only disputing whether the § 547(c)(2) ordinary course of business defense applied.[4] After the lengthy period of discovery, the bankruptcy court granted summary judgment to SMC and dismissed the adversary proceeding.

## II. Jurisdiction and Standard of Review

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[5] Neither party elected to have this appeal heard by the United States District Court for the District of Utah. The parties have therefore consented to appellate review by this Court. The Trustee timely appealed the decision, and the bankruptcy court's order is an appealable, final order.[6]

■■ This Court reviews the bankruptcy court's legal conclusions *de novo* and its findings of fact under the "clearly erroneous" standard of review.[7] The Tenth Circuit has assessed the application of the ordinary course of business defense as "primarily factual" and applied the clearly

---

3. The October 30, 2007 judgment stemmed from a July 5, 2005 lawsuit by Aquila against C.W. Mining for breach of a coal supply agreement.

4. "The 'ordinary course' of business exception in § 547(c)(2) is an affirmative defense to an avoidance procedure." *Jagow v. Grunwald (In re Allied Carriers' Exch., Inc.)*, 375 B.R. 610, 615 (10th Cir.BAP2007).

5. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8001, 8002; 10th Cir. BAP L.R. 8001–3.

6. *See Elec. Metal Prods., Inc. v. Bittman (In re Elec. Metal Prods., Inc.)*, 916 F.2d 1502, 1503 (10th Cir.1990) (appeal of summary judgment in adversary proceeding to recover a preference); *Gonzales v. Conagra Grocery Prods. Co. (In re Furr's Supermarkets, Inc.)*, 373 B.R. 691, 697 (10th Cir. BAP 2007) (holding that an order of a bankruptcy court concluding a preference action was a final, appealable order).

7. *In re Robinson*, 295 B.R. 147, 149 (10th Cir.BAP2003).

erroneous standard of review.[8] A factual finding is clearly erroneous only "if it is without factual support in the record or if, after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made."[9]

## III. Discussion

### A. Burden of Proof

■ SMC, as the transferee of the payment from C.W. Mining, bears the burden of proving the ordinary course of business defense.[10] The ordinary course of business defense should be narrowly construed.[11]

### B. Application of Ordinary Course of Business Defense

■■ The sole issue on appeal is the application of the ordinary course of business defense of 11 U.S.C. § 547(c)(2). That subsection states:

(c) The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms[.][12]

The purpose of the preference statute is to both "prevent[ ] creditors from exerting undue pressure on struggling debtors" and to "discourage 'unusual action' that might 'favor certain creditors or hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out.' "[13] The "general purpose of the § 547(c)(2) defense" to the preference action, however, is " 'to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' "[14] The fact that

---

8. *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993); *see also Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir.1996) ("On this factual question [concerning application of § 547(c)(2) ], we must accept the conclusions of the bankruptcy court unless they are clearly erroneous."); *In re Allied Carriers' Exch., Inc.*, 375 B.R. at 616 ("The bankruptcy court's determination that the transaction at issue fell within the ordinary course of business exception of § 547(c)(2) is a question of fact, reversible only if clearly erroneous.").

9. *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir.2002) (internal quotation marks omitted); *see also* Fed. R. Bankr.P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous[.]").

10. *In re M & L Bus. Mach. Co.*, 84 F.3d at 1339; *see also* 11 U.S.C. § 547(g) ("For the purposes of this section, . . . the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.").

11. *In re M & L Bus. Mach. Co.*, 84 F.3d at 1339.

12. SMC elected to proceed exclusively under § 547(c)(2)(A), and therefore subsection (c)(2)(B) of § 547 is not relevant to this appeal.

13. *Milk Palace Dairy LLC v. L & N Pump, Inc. (In re Milk Palace Dairy LLC)*, 385 B.R. 765, 771 (10th Cir. BAP 2008) (quoting *In re Meridith Hoffman Partners*, 12 F.3d at 1553).

14. *In re M & L Bus. Mach. Co.*, 84 F.3d at 1339–40 (quoting *In re Meridith Hoffman Partners*, 12 F.3d at 1553). *See also Barnhill v. Johnson*, 503 U.S. 393, 402, 112 S.Ct. 1386,

there is no prior history between the parties—the parties here had not engaged in business prior to the longwall electrical system purchase in mid–2007—does not preclude the application of § 547(c)(2).[15]

Although "ordinary course of business" is not defined in the Bankruptcy Code, the statute clearly has two prongs: whether the debt was incurred in the ordinary course of business of the debtor and creditor, and whether the debt payment was made in the ordinary course of business of the debtor and creditor. The first prong is focused on the original transaction between C.W. Mining and SMC when the debt was created. Regarding the "incurred" part of the § 547(c)(2) question, a leading bankruptcy treatise states:

> [C]ourts generally are interested in whether the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace.... If the debt were incurred in the routine operation of the debtor and the creditor, then it can be said to have been incurred in the ordinary course of each party's business.... [A] debt will not be considered incurred in the ordinary course of business if creation of the debt is atypical, fraudulent or not consistent with an arms-length commercial transaction.[16]

This Court must decide, therefore, whether the bankruptcy court was correct to conclude that the debt for the longwall electrical system was incurred by C.W. Mining in the ordinary course of both the business of C.W. Mining and of SMC.

■ The Trustee argues that because the debt arose from C.W. Mining's purchase from SMC of a longwall electrical system of mining—a type of mining different from the type of mining C.W. Mining had previously used—the debt could not have been incurred in the ordinary course of business. In other words, the Trustee argues that the debt could not have been incurred in the ordinary course of C.W. Mining's coal mining business because the debt was for a *longwall* coal mining system, not to support a *continuous* coal mining system. The Trustee also argues that the longwall electrical system purchase was itself extraordinary, because C.W. Mining sought to build the longwall system from refurbished parts—a task for which it had no prior experience.

Decisions from the Tenth Circuit Court of Appeals have not discussed the "incurred" prong of the ordinary course of business defense. However, in an oft-cited bankruptcy court opinion addressing this prong, *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.),*[17] the bankrupt-

118 L.Ed.2d 39 (1992) (stating that § 547(c) was "designed to encourage creditors to continue to deal with troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment").

**15.** *See In re Hedged–Invs. Assocs., Inc.,* 48 F.3d 470, 471–72, 475–76 (10th Cir.1995) (applying § 547(c)(2) when the only payment made to the creditor was a single payment during the preference period, and concluding that the one-time transfer to creditor/investor in Ponzi scheme was not made in ordinary course of business); *see also Kleven v. House-*

*hold Bank F.S.B.,* 334 F.3d 638, 642 (7th Cir.2003) (observing that most courts "side with the view that a first-time transaction is not per se ineligible for protection from avoidance under § 547(c)(2)"); *Gosch v. Burns (In re Finn),* 909 F.2d 903, 908 (6th Cir.1990) (stating that the issuance of a debt "can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the [parties]").

**16.** 5 *Collier on Bankruptcy* ¶ 547.04[2][a][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).

**17.** 182 B.R. 728 (Bankr.W.D.Va.1995).

cy court stated: "courts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or whether it occurred as an insider arrangement with a closely-held entity." [18] The *Valley Steel Corp.* court specifically noted that the "transaction need not have been common; it need only be ordinary." [19]

The decisions of those circuits addressing the "incurred" prong of the ordinary course of business defense have used similar reasoning to that expressed in *Valley Steel Corp.* The Sixth Circuit concluded that the "incurring of longterm consumer debt that is a 'normal financial relation' and that is not 'unusual action'" met the requirement that debt be incurred in the ordinary course of business.[20] The Ninth Circuit has similarly focused on "whether the debt [was incurred] similar to what we would expect of similarly situated parties." [21] On the other side of the coin, the Eighth Circuit found that a gambling debt was *not* incurred in the ordinary course of business because the debt was not incurred to "preserve 'normal financial relations,'" but, rather, was "a desperate debtor's irresponsible accumulation of gambling debts in an ill-fated attempt to cover fraud and embezzlement losses." [22]

■ The Trustee does not dispute either that C.W. Mining was a mining company or that SMC is a mining equipment vendor. The Trustee also does not dispute that C.W. Mining incurred the debt from SMC in an effort to increase its coal mining production, *i.e.,* its primary business purpose. Although we acknowledge that the ordinary course of business defense "should be narrowly construed," [23] the Trustee's focus is misplaced. The bankruptcy court was not tasked with judging the business decisions of C.W. Mining in determining whether debt was incurred in the ordinary course of business. Rather, the bankruptcy court only had to determine whether the debt was incurred ordinarily between C.W. Mining and SMC. As a result, the bankruptcy court properly focused on the creation of the debt at issue, asking whether the transaction was a typical arms-length creation of debt in the open market. The Trustee challenged none of the facts that demonstrated it was such an arms-length transaction in the open market by previously unrelated companies.

■ The second prong of the ordinary course of business defense—whether a debt payment is made in the ordinary course of business—requires that the creditor asserting that the payment was made in the ordinary course of business "establish that the disputed payment was 'ordinary' . . . as between the parties." [24] In

18. *Id.* at 735.

19. *Id.* (internal quotation marks omitted).

20. *In re Finn,* 909 F.2d at 907.

21. *In re Ahaza Sys., Inc.,* 482 F.3d 1118, 1126 (9th Cir.2007).

22. *In re Armstrong,* 291 F.3d 517, 527 (8th Cir.2002).

23. *Jobin v. McKay (In re M & L Bus. Mach. Co.),* 84 F.3d 1330, 1339 (10th Cir.1996).

24. *Milk Palace Dairy LLC v. L & N Pump, Inc. (In re Milk Palace Dairy LLC),* 385 B.R. 765, 769 (10th Cir.BAP2008). Prior to the 2005 amendments to the Bankruptcy Code (oft-referred to as "BAPCPA,"), a creditor was required to show that a transfer was ordinary both subjectively *and* objectively. The BAPCPA amendments to § 547(c)(2) changed the requirements so that the creditor could show *either* subjective ordinariness *or* objective ordinariness, but need not show both. *See id.* at 769 n. 6 (explaining BAPCPA's amendments). SMC proceeded with the subjective prong of ordinariness, under § 547(c)(2)(A), rather

*Milk Palace Dairy,* we analyzed four factors: "1) the length of time involved in the preference period transaction; 2) whether the amount or the form of that payment differed from previous practice; 3) whether that transaction involved any unusual collection or payment activity; and 4) the circumstances under which the transfer was made."[25] Ordinariness is judged both from the perspective of the debtor and the transferee.[26] Ordinary business terms "are those used in 'normal financing relations': the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy."[27]

■ Here, the Trustee asserts the payment was not ordinary because the five payments made from C.W. Mining to SMC came from different C.W. Mining-related accounts. The Trustee also asserts error because the amounts that were paid from C.W. Mining to SMC did not precisely correspond to an invoice amount or a progress payment. The Trustee claims these facts show that the amounts and sources of tender differed from past practice, and that as a result, C.W. Mining engaged in unusual payment activity. Finally, the Trustee claims the bankruptcy court erred in not considering that shortly after C.W. Mining made the October, 2007 payment to SMC, Aquila received a substantial money judgment against C.W. Mining.[28] The Trustee argues that the existence of that judgment supports a finding that the circumstances under which the October, 2007 payment was made were unusual.

We must again note that the Trustee did not challenge the affidavit SMC used to support the facts upon which it based its claim for summary judgment. That affidavit established that the payment terms between SMC and C.W. Mining were typical of SMC's progress payment terms with other customers, and that the "pay as you go" schedule was typical for longwall electrical system purchases. The invoice from SMC to C.W. Mining was large, and SMC established that it was not at all unusual for its customers to make multiple payments on a single invoice, particularly with invoices over $250,000. Further, SMC's affidavit established that the payments by C.W. Mining from multiple accounts were not unique; SMC specifically stated that it was not unusual to receive payment from entities affiliated with or directed by its customers. SMC's affidavit also established that the October 2007 payment was made 28 days after receiving the invoice upon which it was based, and that in SMC's experience, payment within this time frame was typical for its customers.

It is also important that SMC established it did nothing to solicit the October 2007 payment from C.W. Mining. The bankruptcy court specifically found that other than negotiate the original contract terms reflected in Quotation 70312.3, SMC did not provide any instructions to C.W. Mining or its representatives or affiliates regarding the form, manner, or time of payments, nor did SMC make demands of any kind upon C.W. Mining related to payment. The bankruptcy court specifically found that SMC did not engage in

---

than (c)(2)(B)—focusing only on whether the transfer was made in the ordinary course of business of C.W. Mining and SMC.

25. *Id.* at 769.

26. *Gonzalez v. Amplex Corp. (In re Furr's Supermarkets, Inc.),* NM–06–109, 2007 WL 2827459, at *9 (10th Cir. BAP Sept. 26, 2007).

27. *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549, 1553 (10th Cir.1993).

28. The $24 million judgment for Aquila was entered against C.W. Mining on October 30, 2007.

coercive collection activity with regard to the October 2007 payment. The Trustee points to no evidence to contradict these facts; he simply would prefer a different conclusion be drawn from those facts. There is no basis, however, to do so.

We have previously noted that although a payment for "significantly less than the total due" was an indication that a transaction was not subjectively ordinary, the facts that "[t]here was no collection activity with respect to the disputed payment, no pressure put on Debtor to pay, nor any other apparent change in the parties' dealings with respect to [the] payment" indicated a transaction was subjectively ordinary.[29] We have also previously held that payment by cashier's check in an attempt to maintain friendly relations with creditors was not unusual, because it was not unusual for the transferee to receive payment by cashier's check, and because the transferee did nothing to solicit the payment.[30] The payment from C.W. Mining to SMC was similar to the payments in these cited cases; it was a payment made shortly before bankruptcy, but with no other unusual factor surrounding it.

The evidence clearly supports the bankruptcy court's finding that the October 2007 payment was made in the ordinary course of business of C.W. Mining and of SMC. There is nothing about the terms of that payment, or the parties' interactions surrounding the payment, that make the October 2007 payment unusual or extraordinary. Further, there was no implicit or explicit pressure put on C.W. Mining by SMC. Applying the clearly erroneous standard of review, the factual record supports the bankruptcy court's conclusion that SMC carried its burden of proof to show that the October 16, 2007 payment was incurred and made in the ordinary course of business of C.W. Mining and SMC.[31]

## IV. Conclusion

Because we conclude that the bankruptcy court properly applied the ordinary course of business defense of 11 U.S.C. § 547(c)(2)(A) to the facts of this case, we affirm the bankruptcy court's order entering judgment for SMC.

---

29. *In re Milk Palace Dairy, LLC,* 385 B.R. at 769, 770.

30. *Tomlins v. BRW Paper Co., Inc. (In re Tulsa Litho Co.),* 229 B.R. 806, 810–11 (10th Cir. BAP 1999).

31. *Jobin v. McKay (In re M & L Bus. Mach. Co.),* 84 F.3d 1330, 1339 (10th Cir.1996) (transferee has burden of proof); *In re Miniscribe Corp.,* 309 F.3d 1234, 1240 (10th Cir. 2002) (finding is clearly erroneous only when "it is without factual support in the record or if, after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made" (internal quotation marks omitted)).